T.C. Memo. 2018-170

UNITED STATES TAX COURT

RONNIE J. SMITH AND SHEILA C. SMITH, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24821-15.                    Filed October 15, 2018.

Bryan W. Caddell, for petitioners.

William F. Castor, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge: Respondent determined deficiencies in petitioners'

Federal income tax (tax) for their taxable years 2011, 2012, and 2013 of $74,364,

$7,164, and $9,922, respectively.

[*2]  The issues remaining for decision are:[1]

(1) Are petitioners required for each of their taxable years 2011, 2012, and 2013 to include in income the amount of "[t]otal income" that their wholly owned S corporation reported in its tax return for each of those years as well as a certain additional amount of income that respondent determined in the notice for each of those years?  We hold that they are.

(2) Are petitioners entitled for each of their taxable years 2011, 2012, and 2013 to deduct any expenses with respect to certain respective personal services that they performed during each of those years?  We hold that they are not.

(3) Are petitioners entitled for their taxable year 2011 to deduct $21,940 with respect to a claimed net operating loss carryover?  We hold that they are not.

## FINDINGS OF FACT[2]

Some of the facts have been stipulated and are so found.

Petitioners resided in Oklahoma at the time they filed the petition.

---

[1]There are other questions relating to certain determinations in the notice of deficiency for petitioners' taxable years 2011, 2012, and 2013 (notice) that are computational in that their resolution flows automatically from our resolution of the issues that we address herein.

[2]Unless otherwise indicated, our findings of fact and opinion pertain to petitioners' taxable years 2011, 2012, and 2013, the years at issue.  For clarity, we sometimes expressly refer in our findings of fact and opinion to one or more of those years.

**[*3]**  Petitioner, Ronnie J. Smith (Mr. Smith), worked as an employee of Lucent Technologies (Lucent) for almost 29 years until he retired in 1999.  Since his retirement, Mr. Smith received at all relevant times, including during 2011, 2012, and 2013, certain retirement income from Lucent.  At all relevant times, including during 2011, 2012, and 2013, Mr. Smith received Social Security benefits, as did petitioner, Sheila C. Smith (Ms. Smith).  (We shall sometimes refer collectively to Mr. Smith and Ms. Smith as the Smiths.)

From at least 2007 through at least 2013, Mr. Smith performed certain personal services as a handyman, and Ms. Smith performed certain personal services as an office manager for Hillcrest Golf & Country Club (Hillcrest).

In July 2007, pursuant to the advice of Warren W. Simpson, who was the Smiths' accountant and the president of Spectrum Financial (Spectrum), an accounting firm, the Smiths incorporated under the laws of the State of Oklahoma, and each owned 50 percent of the outstanding stock of, Smith Solutions, Inc. (Smith Solutions).  For taxable years 2007 through at least 2013, Smith Solutions was an S corporation for tax purposes.

On the date on which the Smiths incorporated Smith Solutions, its board of directors (board), which consisted of Mr. Smith and Ms. Smith, held an organizational meeting.  At that meeting, the board (1) adopted the bylaws of Smith Solu-

[*4] tions (bylaws), (2) elected Mr. Smith as president and Ms. Smith as both secretary and treasurer of Smith Solutions,[3] (3) passed a resolution to open a bank account for Smith Solutions (bank account resolution),[4] and (4) passed a resolution authorizing and directing the president of Smith Solutions "to enter into employment contracts with certain employees" (employment contract resolution).

As noted above, the employment contract resolution authorized and directed the president of Smith Solutions "to enter into employment contracts with certain employees" and required that "such contract * * * be for the term and the rate stated in the attached Employment Agreements." At no time did Smith Solutions enter into any employment agreement, written or oral, with any person, including Mr. Smith or Ms. Smith. At no time did Mr. Smith consider himself or Ms. Smith to be an employee of Smith Solutions.

Pursuant to its bylaws, Smith Solutions was authorized to pay Mr. Smith and Ms. Smith salaries in their respective positions as its president and its secretary and treasurer. However, at no time did Smith Solutions pay Mr. Smith or Ms.

---

[3]At all relevant times, Mr. Smith and Ms. Smith retained their positions as the directors and the officers of Smith Solutions.

[4]The document containing the bank account resolution, entitled "RESOLUTION: OPEN BANK/CHECKING ACCOUNTS", did not include the name of any bank in the blank space provided for such a designation.

[*5] Smith any compensation in those respective positions. Nor did it at any time pay Mr. Smith or Ms. Smith any wages or other compensation in some other capacity.

During at least 2011 and most of 2012, Hillcrest received monthly invoices (Hillcrest invoices) with respect to Ms. Smith's services as its office manager.[5] Each of those invoices showed the amount due for each month with respect to those services. The following language appeared at the top of each of the Hillcrest invoices:

Sheila Smith
Smith Solutions, Inc. FED ID# * * *
* * * * * * * * * * *
Oklahoma City, OK 73159

The address shown at the top of each Hillcrest invoice is the Smiths' home address. The bottom of each Hillcrest invoice was digitally signed in the name of "Sheila C. Smith".

During 2011, 2012, and 2013, Hillcrest made payments to Smith Solutions for Ms. Smith's personal services that totaled $6,189, $12,404, and $6,570,[6]

---

[5]There are no Hillcrest invoices in the record for the months of July, October, and December 2012 or for any months in 2013.

[6]We found that during 2013 Hillcrest made payments to Smith Solutions totaling $6,570 for Ms. Smith's personal services. The parties stipulated that dur-

(continued...)

**[\*6]** respectively.  Hillcrest made certain of those payments by check payable to "Smith Solutions, Inc." (Hillcrest checks).

Hillcrest issued Form 1099-MISC, Miscellaneous Income, for each of 2011 (Hillcrest 2011 Form 1099-MISC), 2012 (Hillcrest 2012 Form 1099-MISC), and 2013 (Hillcrest 2013 Form 1099-MISC).[7]  (We shall sometimes refer collectively to the Hillcrest 2011 Form 1099-MISC, the Hillcrest 2012 Form 1099-MISC, and the Hillcrest 2013 Form 1099-MISC as the Hillcrest Forms 1099-MISC.)  The IRMF data that the IRS maintained with respect to each of the Hillcrest Forms 1099-MISC showed the name "SHIELA [sic] SMITH" under the heading

---

[6](...continued)
ing 2013 Hillcrest paid Smith Solutions $6,750 for Ms. Smith's personal services.  The parties also stipulated that in the notice respondent determined for petitioners' taxable year 2013 to include $6,750 in Schedule C, Profit or Loss From Business (Schedule C), relating to the personal services that Ms. Smith rendered to Hillcrest during that year.  It appears that there may have been typographical errors in the amounts stated in those stipulations.  The respective amounts stated in those stipulations are clearly contrary to the facts that we have found are established by the record, and we shall disregard them.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

[7]Hillcrest 2011 Form 1099-MISC, Hillcrest 2012 Form 1099-MISC, and Hillcrest 2013 Form 1099-MISC are not in the record.  Instead, copies of pertinent portions of the so-called Information Returns Master File (IRMF) online taxpayer system (IRMF data) that the Internal Revenue Service (IRS) maintained with respect to those forms and that showed the data that Hillcrest reported on each of those forms are in the record.  As discussed below, at no time was Hillcrest required to issue Form 1099-MISC to a corporation such as Smith Solutions.

[*7] "PAYEE ENTITY DATA", the name "HILLCREST GOLF & COUNTRY CLUB" under the heading "PAYER ENTITY DATA",[8] and "NONEM COM" paid of $6,819, $12,404, and $6,570 for 2011, 2012, and 2013, respectively.

During the period from at least 2011 through 2012, Mr. Smith periodically performed certain personal services as a handyman for Integris Health (Integris), Eskridge Honda (Eskridge), Michael and Sandra Milligan (collectively, Milligans), and James and Cathy Adams (collectively, Adamses).

Each of Integris, Eskridge, and the Milligans received certain invoices relating to Mr. Smith's performance of certain personal services (sometimes collectively, invoices relating to Mr. Smith's personal services).[9]  The following language appeared at the top of each of the invoices relating to Mr. Smith's personal services:

<table>
<tr><td>Smith Solutions, Inc.</td><td>Smith Solutions, Inc.<br>* * * * * * * * * * * *<br>Oklahoma City, Oklahoma 73159<br>* * * * * * * * * * * *<br>FED ID# * * *</td></tr>
</table>

---

[8]The name "Willow Creek Golf and Country Club" appeared under the heading "PAYER ENTITY DATA" for taxable year 2013.

[9]The record does not contain any invoices sent to, or received by, the Adamses relating to certain personal services that Mr. Smith performed for them.

[*8] The address shown at the top of each of the invoices relating to Mr. Smith's personal services is the Smiths' home address. Each of those invoices showed, inter alia, the date(s) on which Mr. Smith performed certain personal services, the number of hours that he worked on each day, and the hourly rate charged for those services.

During at least 2011, Integris made certain payments by check relating to Mr. Smith's performance of certain personal services for it (Integris checks). Most of the Integris checks were made payable to "Smith Solutions, Inc." Two of the Integris checks, both of which were dated October 13, 2011, were made payable to "Sheila Smith".

During at least 2011 and 2012, Eskridge made certain payments by check relating to Mr. Smith's performing certain personal services for it (Eskridge checks). Most of the Eskridge checks were made payable to "Smith Solutions, Inc." One of the Eskridge checks, dated February 11, 2011, was made payable to "Ron Smith".

During at least 2011 and 2012, the Milligans made certain payments by check relating to Mr. Smith's performance of certain personal services for them (Milligan checks). One of the Milligan checks, dated May 20, 2011, was made

**[*9]** payable to "Smith Solutions, Inc." Certain of the Milligan checks, dated January 30 and June 20, 2012, respectively, were made payable to "Ron Smith".

During at least 2011 and 2012, the Adamses made certain payments by check relating to Mr. Smith's performance of certain personal services for them (Adamses checks). Virtually all of the Adamses checks were made payable to "Ron Smith".

At all relevant times, petitioners maintained various bank accounts at WEOKIE Credit Union (WEOKIE), in Oklahoma City, Oklahoma. Petitioners maintained a savings account identified as "S011" (savings account); two checking accounts identified as "S013" and "S014", respectively (S013 checking account and S014 checking account, respectively); a money market account identified as "S019" (money market account); and a certificate of deposit account identified as "S021" (COD account). (We shall refer collectively to the savings account, the S013 checking account, the S014 checking account, the money market account, and the COD account as the WEOKIE accounts.)

Petitioners did not maintain any bank account in the name of, or on behalf of, Smith Solutions. During the years at issue, petitioners deposited into one or more of the WEOKIE accounts, inter alia, Hillcrest checks, Integris checks, Eskridge checks, Milligan checks, and Adamses checks.

**[*10]** Spectrum prepared Form 1120S, U.S. Income Tax Return for an S Corporation (Form 1120S), for Smith Solutions for each of its taxable years 2011 (2011 Form 1120S), 2012 (2012 Form 1120S), and 2013 (2013 Form 1120S).

In its 2011 Form 1120S, Smith Solutions claimed "[t]otal income (loss)" of $29,805 consisting of "[m]erchant card and third-party payments", "[t]otal deductions" of $26,127, and "[o]rdinary business income (loss)" of $3,678. Smith Solutions' total deductions of $26,127 consisted of $568 of "[r]epairs and maintenance", $85 of "[t]axes and licenses", $4,438 of "[d]epreciation", and $21,036 of "[o]ther deductions". The $21,036 of other deductions comprised the following:

| Item | Amount |
|---|---|
| Accounting | $510 |
| Auto and truck expense | 1,124 |
| Meals (50%) | 402 |
| Office expense | 17 |
| Supplies | 6,806 |
| Telephone | 1,059 |
| Medical | 9,606 |
| Home office rent | 1,512 |
| Total | 21,036 |

**[*11]** Smith Solutions did not claim as a deduction in its 2011 Form 1120S any "[c]ompensation of officers" or "[s]alaries and wages".

Smith Solutions included Schedule K, Shareholders' Pro Rata Share Items (Schedule K), with its 2011 Form 1120S (2011 Schedule K). The 2011 Schedule K showed "[o]rdinary business income (loss)" of $3,678, a "[s]ection 179 deduction"[10] of $409, and "[i]ncome/loss reconciliation" of $3,269.

In its 2012 Form 1120S, Smith Solutions claimed "[t]otal income (loss)" of $14,830 consisting of "[g]ross receipts or sales", "[t]otal deductions" of $30,422, and "[o]rdinary business income (loss)" of – $15,592. Smith Solutions' total deductions of $30,422 consisted of $43 of "[t]axes and licenses", $4,106 of "[d]epreciation", and $26,273 of "[o]ther deductions". The $26,273 of other deductions comprised the following:

---

[10]All section references are to the Internal Revenue Code (Code) in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[*12]

| Item | Amount |
|---|---|
| Accounting | $560 |
| Auto and truck expense | 4,946 |
| Insurance | 1,083 |
| Meals (50%) | 378 |
| Office expense | 906 |
| Supplies | 2,701 |
| Telephone | 623 |
| Medical | 13,024 |
| Home office rent | 1,621 |
| Multimedia | 431 |
| Total | 26,273 |

Smith Solutions did not claim as a deduction in its 2012 Form 1120S any "[c]ompensation of officers" or "[s]alaries and wages".

Smith Solutions included Schedule K with its 2012 Form 1120S (2012 Schedule K). The 2012 Schedule K showed "[o]rdinary business income (loss)" of -$15,592, and "[i]ncome/loss reconciliation" of -$15,592.

In its 2013 Form 1120S, Smith Solutions claimed "[t]otal income (loss)" of $9,036 consisting of "[g]ross receipts or sales" of $10,196 less "[c]ost of goods sold" of $1,160, "[t]otal deductions" of $20,080, and "[o]rdinary business income (loss)" of -$11,044. Smith Solutions' total deductions of $20,080 consisted of

[*13] $44 of "[t]axes and licenses", $2,983 of depreciation, and $17,053 of

"[o]ther deductions".  The $17,053 of other deductions comprised the following:

| Item | Amount |
|---|---|
| Accounting | $560 |
| Auto and truck expense | 3,099 |
| Meals reduced | 370 |
| Office expense | 943 |
| Supplies | 6,691 |
| Telephone | 806 |
| Home office rent | 1,322 |
| Multimedia | 3,262 |
| Total | 17,053 |

Smith Solutions did not claim as a deduction in its 2013 Form 1120S any "[c]om-

pensation of officers" or "[s]alaries and wages".

Smith Solutions included Schedule K with its 2013 Form 1120S (2013

Schedule K).  The 2013 Schedule K showed "[o]rdinary business income (loss)"

of –$11,044, and "[i]ncome/loss reconciliation" of –$11,044.

Smith Solutions issued to each of Mr. Smith and Ms. Smith Schedule K-1,

Shareholder's Share of Income, Deductions, Credits, etc. (Schedule K-1), for each

[*14] of its taxable years 2011 (collectively, 2011 Schedules K-1), 2012 (collectively, 2012 Schedules K-1), and 2013 (collectively, 2013 Schedules K-1).

In each of its 2011 Schedules K-1, Smith Solutions showed $1,839 as each of Mr. Smith's and Ms. Smith's shares of its claimed "[o]rdinary business income (loss)" of $3,678 and $205 as each of their shares of its claimed "[s]ection 179 deduction" of $409.

In each of its 2012 Schedules K-1, Smith Solutions showed ‒$7,796 as each of Mr. Smith's and Ms. Smith's shares of its claimed "[o]rdinary business income (loss)" of ‒$15,592.

In each of its 2013 Schedules K-1, Smith Solutions showed ‒$5,522 as each of Mr. Smith's and Ms. Smith's shares of its claimed "[o]rdinary business income (loss)" of ‒$11,044.

Spectrum prepared Form 1040, U.S. Individual Income Tax Return (return), for petitioners for each of their taxable years 2011 (2011 return), 2012 (2012 return), and 2013 (2013 return).

In their 2011 return, petitioners reported, inter alia, "[w]ages, salaries, tips, etc." of $89 and "[o]ther income" of ‒$21,940 with respect to a claimed net operating loss carryover. Petitioners included Schedule E, Supplemental Income and Loss (Schedule E), with their 2011 return (2011 Schedule E). In their 2011

[*15] Schedule E, petitioners claimed with respect to Smith Solutions total "[n]on-passive income from Schedule K-1" of $3,678, a "[s]ection 179 expense deduction" of $410, and "[t]otal partnership and S corporation income or (loss)" of $3,268.

In their 2012 return, petitioners reported, inter alia, "[w]ages, salaries, tips, etc." of $18. Petitioners included Schedule E with their 2012 return (2012 Schedule E). In their 2012 Schedule E, petitioners claimed with respect to Smith Solutions a total "[n]onpassive loss from Schedule K-1" of -$15,592, and "[t]otal partnership and S corporation income or (loss)" of -$15,592.

In their 2013 return, petitioners reported, inter alia, no "[w]ages, salaries, tips, etc." Petitioners included Schedule E with their 2013 return (2013 Schedule E). In their 2013 Schedule E, petitioners claimed with respect to Smith Solutions a total "[n]onpassive loss from Schedule K-1" of -$11,044, and "[t]otal partnership and S corporation income or (loss)" of -$11,044.

Respondent assigned a revenue agent to examine each of Smith Solutions' taxable years 2011, 2012, and 2013. Thereafter, the revenue agent expanded that examination to include each of petitioners' taxable years 2011, 2012, and 2013. Petitioners did not maintain books and records relating to Smith Solutions and gave the revenue agent only certain redacted bank statements relating to their

**[\*16]** taxable year 2011.  Consequently, the revenue agent obtained by summonses unredacted bank statements relating to each of petitioners' taxable years 2011, 2012, and 2013.

After having obtained the unredacted bank statements for each of petitioners' taxable years 2011, 2012, and 2013, the revenue agent performed a bank deposits analysis in order to ascertain whether Smith Solutions had underreported the gross receipts that it had reported in each of its 2011 Form 1120S, 2012 Form 1120S, and 2013 Form 1120S.  (We shall refer collectively to the revenue agent's bank deposits analysis for each of petitioners' taxable years 2011, 2012, and 2013 as the bank deposits analyses in question.)

As part of the bank deposits analyses in question, the revenue agent analyzed each deposit into each of the WEOKIE accounts during each of the years 2011, 2012, and 2013 in order to determine the total deposits into each of those accounts, and the total deposits into all of those accounts, during each of those years.  The revenue agent then analyzed each deposit into the WEOKIE accounts during each of the years 2011, 2012, and 2013 in an effort to determine whether any of those deposits was not taxable because, for example, it was a loan, a transfer from another bank account, or another type of nontaxable deposit.  As a final step in the bank deposits analyses in question, the revenue agent reduced the total

[*17] deposits into the WEOKIE accounts during each of the years 2011, 2012, and 2013 that she had determined by the total amount that she had determined were nontaxable deposits in order to arrive at the total amount of taxable deposits into the WEOKIE accounts for each of those years.

Pursuant to the bank deposits analyses in question, the revenue agent determined that petitioners had total taxable deposits for their taxable years 2011, 2012, and 2013 of $199,752, $15,612, and $21,203, respectively. The revenue agent concluded that during each of the years 2011, 2012, and 2013 Mr. Smith in his individual capacity and Ms. Smith in her individual capacity, and not Smith Solutions, had performed certain personal services for certain persons. The revenue agent decided that consequently the total taxable deposits for each of petitioners' taxable years 2011, 2012, and 2013 that she had determined pursuant to the bank deposits analyses in question should be allocated between Mr. Smith and Ms. Smith. The revenue agent further concluded that the respective amounts of taxable deposits for those years so allocated should be included as gross income in separate respective Schedules C for Mr. Smith and for Ms. Smith for petitioners' taxable years 2011, 2012, and 2013.

In deciding how to allocate to Ms. Smith a portion of the total taxable deposits that she had determined for each of petitioners' taxable years 2011, 2012,

**[\*18]** and 2013, the revenue agent began by reviewing the Hillcrest Forms 1099-MISC. That is because Ms. Smith had performed certain personal services during each of those years only for Hillcrest. The revenue allocated to Ms. Smith for petitioners' taxable years 2011, 2012, and 2013 is the respective amounts of non-employee compensation that Hillcrest showed it had paid in the Hillcrest Forms 1099-MISC during those years for Ms. Smith's personal services, i.e., $6,819, $12,404, and $6,570 for 2011, 2012, and 2013, respectively. The revenue agent then reduced the respective total taxable deposits of $199,752, $15,612, and $21,203 that she had determined for petitioners' taxable years 2011, 2012, and 2013 by those respective amounts of nonemployee compensation that Hillcrest paid for Ms. Smith's personal services. The revenue agent allocated to Mr. Smith the respective balances of those respective total taxable deposits for those years, i.e., $192,933, $3,208, and $14,633 for petitioners' taxable years 2011, 2012, and 2013, respectively.

Respondent issued the notice to petitioners. In the notice, respondent determined that each of Mr. Smith and Ms. Smith has the following amounts of

[*19] Schedule C income[11] for their taxable years 2011, 2012, and 2013 from the performance of personal services during those years:[12]

| Name | 2011 | 2012 | 2013 |
|------|------|------|------|
| Mr. Smith | $192,933 | $3,208 | $14,633 |
| Ms. Smith | 6,819 | 12,404 | 6,570 |

Respondent further determined in the notice that petitioners are not entitled for their taxable year 2011 to a deduction of $21,940 with respect to a claimed net operating loss carryover.

OPINION

We address first petitioners' position that the presumption of correctness that is generally accorded to determinations in a notice of deficiency does not apply here and that consequently petitioners do not have the burden of establishing that respondent's determinations in the notice that they are contesting are erroneous. In support of that position, petitioners allege that the revenue agent "made

---

[11]The respective sums of the respective total amounts of Schedule C income for petitioners' taxable years 2011, 2012, and 2013 that respondent determined Mr. Smith and Ms. Smith have for those years equal the total taxable deposits that the revenue agent determined on the basis of the bank deposits analyses in question.

[12]Respondent also determined in the notice to disallow the Schedule E "Total partnership and S corporation income or (loss)" that petitioners claimed in each of their 2011 return, 2012 return, and 2013 return.

[*20] numerous mistakes in [the] calculation of the F4549-A [Income Tax Examination Changes attached to the notice], and those mistakes, cumulatively, constitute a violation of the 'presumption of correctness' on the F4549-A."

By way of illustration of the types of claims that petitioners advance in support of their position that the presumption of correctness that is generally accorded to determinations in a notice of deficiency does not apply here, petitioners claim that the revenue agent should have examined petitioners' tax returns for years prior to the taxable years at issue in order to determine the validity of their claimed deduction for their taxable year 2011 with respect to a claimed net operating loss carryforward. By way of further illustration, petitioners claim that certain of the taxable deposits that the revenue agent determined on the basis of the bank deposits analyses in question are not taxable.

We believe that petitioners are attempting to look behind the notice in this case. As a general rule, we will not look behind a notice of deficiency to examine the evidence used or the propriety of the Commissioner's motives in making the Commissioner's determinations. See Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974). We have recognized two exceptions to that general rule. See Graham v. Commissioner, 82 T.C. 299, 308-309 (1984), aff'd, 770 F.2d 381 (3d Cir. 1985). First, we may look behind a notice of deficiency where there is

**[\*21]** substantial evidence of unconstitutional conduct by the Commissioner. See id. at 308. Second, we may look behind a notice of deficiency where the Commissioner of Internal Revenue introduces no evidence but instead rests on the presumption of correctness and the taxpayer challenges the notice on the grounds that it is arbitrary. See id. at 308-309.

None of petitioners' claims supports their position that the presumption of correctness that is generally accorded to determinations in a notice of deficiency does not apply here and that consequently petitioners do not have the burden of establishing that respondent's determinations in the notice that they are contesting are erroneous. The record is devoid of any evidence of unconstitutional conduct by respondent, let alone any substantial evidence of unconstitutional conduct. In addition, respondent is not merely relying on the presumption of correctness that is generally accorded to determinations in a notice of deficiency; respondent introduced certain documentary and testimonial evidence in this case.

On the record before us, we hold that we will not look behind the notice that respondent issued to petitioners for their taxable years 2011, 2012, and 2013. On that record, we further hold that the presumption of correctness that is generally accorded to determinations in a notice of deficiency applies to the determinations in the notice that respondent issued to petitioners for those years. We also hold

**[\*22]** that petitioners bear the burden of establishing that respondent's determinations in the notice that remain at issue are erroneous.

Before turning to the issues that remain for our consideration, we address petitioners' attempts on brief to disregard certain stipulations in the stipulation of facts that the parties signed and that we made part of the record at the beginning of the trial in this case. Rule 91(e) provides that a stipulation, to the extent of its terms, is to be treated as a conclusive admission by the parties to the stipulation, unless otherwise permitted by us or agreed upon by those parties. We will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part except that we may do so where justice requires. See id.

On the record before us, we hold that justice does not require us to set aside any of the stipulations that petitioners attempt to disregard on brief. See id. On that record, we further hold that, except as stated supra note 6, and as discussed below with respect to the Hillcrest Forms 1099-MISC, we find no evidence that is clearly contrary to any of those stipulations, and we will not disregard them. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

One final matter that we address before considering the issues that remain for decision is that petitioners' briefs are replete with factual allegations that are not established by the record in this case. By way of illustration, petitioners con-

[*23] tend that they maintained "a Balance Sheet, a Profit and Loss [sic], and extensive other books and records" relating to Smith Solutions. The record is devoid of any such documents. Another example of an unsupported factual allegation that petitioners advance on brief is their allegation that certain deposits that respondent determined are taxable are in fact nontaxable gifts and/or inheritances that they received from Ms. Smith's mother. The record is devoid of reliable evidence establishing that allegation. We will not rely on any of petitioners' factual allegations that are not established by the record in order to resolve the issues presented.

We now turn to the issues that we must decide. We address first whether petitioners are required for each of their taxable years 2011, 2012, and 2013 to include in income the amount of "[t]otal income" that their wholly owned S corporation reported in each of its 2011 Form 1120S, 2012 Form 1120S, and 2013 Form 1120S as well as a certain additional amount of income that respondent determined in the notice for each of those years. In order to resolve that issue, we must decide whether the respective personal services that Mr. Smith and Ms. Smith performed for certain persons during 2011, 2012, and 2013 were performed in their respective individual capacities or as employees or other agents of Smith Solutions.

[*24] It is well established that income must be taxed to the actual earner of the income. See, e.g., United States v. Basye, 410 U.S. 441 (1973); Commissioner v. Culbertson, 337 U.S. 733 (1949); Lucas v. Earl, 281 U.S. 111 (1930). "In the corporate context, however, the actual earner test may be inadequate because a corporation can earn income only through the personal services of its employees and agents." Haag v. Commissioner, 88 T.C. 604, 611 (1987), aff'd without published opinion, 855 F.2d 855 (8th Cir. 1988). Where a corporation relies on the personal services of an employee to produce income, the question arises whether the corporation is actually conducting the business or whether the employee is conducting the business in his/her individual capacity. The relevant test is who controls the earning of the income. See, e.g., Haag v. Commissioner, 88 T.C. at 611; Vercio v. Commissioner, 73 T.C. 1246, 1253 (1980).

In United States v. Hartshorn, 751 F.3d 1194 (10th Cir. 2014), the U.S. Court of Appeals for the Tenth Circuit (Court of Appeals), the court to which an appeal in this case would normally lie, was asked to decide whether to sustain an injunction under section 7408 that the U.S. District Court for the District of Utah had imposed against an individual for promoting an abusive tax shelter in violation of section 6700. In order to decide that issue, the Court of Appeals considered whether a minister of a church is required to include in income and pay tax

[*25] on income that he/she earns in his/her normal employment as a minister and assigns to his/her church.  In order to resolve that question, the Court of Appeals first addressed "whether a minister's income is tax exempt only if he receives it as an agent of the church or whether * * * it is sufficient that a minister assigns earnings to his church pursuant to a vow of poverty."  Hartshorn, 751 F.3d at 1198.  In answering that latter question, the Court of Appeals examined the decisions of certain other U.S. Courts of Appeals in the so-called vow-of-poverty context.  The Court of Appeals concluded on the basis of that review that those other courts had held that a minister must be acting as an agent of the minister's church in order for the minister's income to be exempt from tax.  See id. at 1200.

In Hartshorn, the Court of Appeals adopted the facts and circumstances approach that the U.S. Court of Appeals for the Federal Circuit had adopted in a vow-of-poverty context in Fogarty v. United States, 780 F.2d 1005 (Fed. Cir. 1986), as the appropriate test to use in order to determine whether a minister is acting as an agent of the minister's church in earning income.  According to the Court of Appeals, under such a facts and circumstances approach "courts may consider various factors pertinent to the relationships between the religious order and the minister, between the minister and the third-party employer, and between the employer and the order."  Hartshorn, 751 F.3d at 1200.  (We shall refer to the

**[*26]** facts and circumstances approach that the Court of Appeals adopted in Hartshorn as the Hartshorn test.)

Although the ultimate issue in Hartshorn was whether to sustain an injunction, we believe that the Court of Appeals would apply the Hartshorn test in determining whether petitioners are required for each of their taxable years 2011, 2012, and 2013 to include in income the amount of "[t]otal income" that their wholly owned S corporation reported in each of its 2011 Form 1120S, 2012 Form 1120S, and 2013 Form 1120S. In our jurisprudence we have applied the so-called two-prong test announced in Johnson v. Commissioner, 78 T.C. 882, 891 (1982), aff'd without published opinion, 734 F.2d 20 (9th Cir. 1984), in determining who earns income in a corporate context. However, we would reach the same result in resolving the issue presented here whether we apply the Hartshorn test or that two-prong test.

We begin by examining the relationship during the years at issue between Smith Solutions and each of Mr. Smith and Ms. Smith, see Hartshorn, 751 F.3d at 1200, in order to ascertain whether each of those relationships enabled Smith Solutions to exercise control over the provision to certain persons of certain personal services by each of them and over the receipt of the payments for those respective services. Petitioners contend that the bylaws of Smith Solutions con-

[*27] stituted "the controlling written agreement" between Smith Solutions and each of Mr. Smith and Ms. Smith[13] and that those bylaws "provide[] a means for the setting of salary for compensation of its officers (Petitioners)".

The bylaws of Smith Solutions contain nothing but typical boilerplate relating to the responsibilities that the Smiths owed to Smith Solutions as corporate directors and officers. Those bylaws do not establish that the Smiths owed any contractual duties to Smith Solutions to perform any personal services on its behalf. Nothing in the bylaws of Smith Solutions or in any other evidence in the record establishes that Smith Solutions was able to control the performance of respective personal services by Mr. Smith and Ms. Smith. See Hartshorn, 751 F.3d at 1200; Haag v. Commissioner, 88 T.C. at 612. Nor do those bylaws[14]

---

[13]According to petitioners, "[t]he Bylaws document was drafted by an attorney who should have known the legal requirements for a controlling written agreement."

[14]One provision of the Smith Solutions bylaws entitled "Deposits" stated that "[a]ll funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the Corporation in such banks, trust companies or other depositories as the Board of Directors may select." That provision does not address the performance of respective personal services by Mr. Smith and Ms. Smith. Nor does it indicate what funds are "funds of the Corporation not otherwise employed". We note that in the bank account resolution the Smith Solutions' board did not designate in the blank space provided the name of a bank or other depository institution into which "[a]ll funds of the Corporation not otherwise employed shall be deposited from time to time".

[*28] establish that Smith Solutions "possessed the actual power to control the receipt of funds", Pacella v. Commissioner, 78 T.C. 604, 622 (1982), for the performance of those respective personal services, see Hartshorn, 751 F.3d at 1200.

Another significant factor in determining whether Smith Solutions in fact earned the income that it reported in its 2011 Form 1120S, its 2012 Form 1120S, and its 2013 Form 1120S relates to the employment contract resolution that its board adopted. That resolution authorized and directed the president of Smith Solutions "to enter into employment contracts with certain employees" and required that "such contract * * * be for the term and the rate stated in the attached Employment Agreements." At no time did Smith Solutions enter into any employment agreement, written or oral, with any person, including Mr. Smith or Ms. Smith. Moreover, at no time did Mr. Smith consider himself or Ms. Smith to be an employee of Smith Solutions. In addition, the record is devoid of evidence establishing that Smith Solutions would have any legal recourse against Mr. Smith and Ms. Smith if they stopped performing their respective personal services for certain persons. See Vercio v. Commissioner, 73 T.C. at 1254.

It also is significant that Smith Solutions never compensated Mr. Smith and Ms. Smith for the performance of their respective personal services for certain persons. Nor did Smith Solutions report in its 2011 Form 1120S, 2012 Form

**[*29]** 1120S, and 2013 Form 1120S any compensation of officers or salaries of employees. Moreover, Mr. Smith and Ms. Smith did not report in their 2011 return, 2012 return, and 2013 return any wages or other compensation that Smith Solutions paid them during 2011, 2012, and 2013. That is because Smith Solutions never paid them any wages or other compensation. See Ruckman v. Commissioner, T.C. Memo. 1998-83, 1998 WL 77987, at *5.

We also find it significant in determining whether Smith Solutions in fact earned the income that it reported in its 2011 Form 1120S, its 2012 Form 1120S, and its 2013 Form 1120S that there was no contractual relationship or similar indicium between Smith Solutions and the persons using the respective personal services of Mr. Smith and Ms. Smith that recognized or acknowledged that Smith Solutions controlled them in the performance of those respective services. See, e.g., Hartshorn, 751 F.3d at 1200; Ruckman v. Commissioner, 1998 WL 77987, at *5.

With respect to the personal services that Ms. Smith performed for Hillcrest, petitioners rely on the Hillcrest invoices that it received during 2011 and 2012 as a factor weighing in their favor in determining whether Smith Solutions in fact earned the income that it reported in its 2011 Form 1120S, its 2012 Form 1120S, and its 2013 Form 1120S. Those invoices contained the same caption. That cap-

[*30] tion showed the name "Smith Solutions, Inc." However, the name "Sheila Smith" also appeared immediately above the name "Smith Solutions, Inc." We are unable to find on the basis of the Hillcrest invoices that Hillcrest received during 2011 and 2012 that Hillcrest recognized or understood that it was contracting with Smith Solutions for certain personal services of Ms. Smith, and not with Ms. Smith in her individual capacity. Nor are we able to find from those invoices that Hillcrest recognized or understood that Smith Solutions was exercising control over Ms. Smith with respect to the personal services that she performed for it.

Petitioners also rely on the Hillcrest checks that were payable to "Smith Solutions, Inc." as a factor weighing in their favor in determining whether Smith Solutions in fact earned the income that it reported in its 2011 Form 1120S, its 2012 Form 1120S, and its 2013 Form 1120S. Although those checks establish that Hillcrest was aware of the existence of Smith Solutions, they do not establish that Hillcrest recognized or understood that it was contracting with Smith Solutions for the performance of certain personal services by Ms. Smith. We are not persuaded that Hillcrest made the Hillcrest checks payable to Smith Solutions because it considered Smith Solutions as (1) the contracting party for the personal services that Ms. Smith performed for it, (2) the entity that exercised control over Ms. Smith with respect to the performance of those services, and (3) the entity that was

[*31] entitled to compensation for those services. We believe that Hillcrest made the Hillcrest checks payable to Smith Solutions because Ms. Smith asked it to do so.

Petitioners also point to the Hillcrest 2011 Form 1099-MISC, the Hillcrest 2012 Form 1099-MISC, and the Hillcrest 2013 Form 1099-MISC as favorable facts in determining whether Smith Solutions in fact earned the income that it reported in its 2011 Form 1120S, its 2012 Form 1120S, and its 2013 Form 1120S.[15] The IRMF data that the IRS maintained with respect to each of the Hillcrest Forms 1099-MISC showed the name "SHIELA [sic] SMITH " under the heading "PAYEE ENTITY DATA", the name "HILLCREST GOLF & COUN-TRY CLUB" under the heading "PAYER ENTITY DATA",[16] and "NONEM COM" paid of $6,819, $12,404, and $6,570 for 2011, 2012, and 2013, respec-tively. Although the parties stipulated that the Hillcrest Forms 1099-MISC were "issued to Smith Solutions", that stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. See Cal-Maine

---

[15]The Hillcrest 2011 Form 1099-MISC, the Hillcrest 2012 Form 1099-MISC, and the Hillcrest 2013 Form 1099-MISC are not in the record. Instead, copies of pertinent portions of the IRMF data that the IRS maintained with respect to those forms and that showed the data that Hillcrest reported on each of those forms are in the record.

[16]See supra note 8.

[*32] <u>Foods, Inc. v. Commissioner</u>, 93 T.C. at 195.  We find on the basis of the IRMF data that Hillcrest understood that it had paid Ms. Smith nonemployee compensation for the personal services that she had performed for it.  It is significant in this regard that at no time was Hillcrest required to issue Form 1099-MISC to a corporation such as Smith Solutions.  Only if a service provider is other than a corporation is the person for whom personal services are rendered during a taxable year required to issue Form 1099-MISC showing the compensation that the person paid during the taxable year to such a service provider.  <u>See</u> sec. 1.6041-3(p)(1), Income Tax Regs.

With respect to the respective personal services that Mr. Smith performed for Integris, Eskridge, the Milligans, and the Adamses, petitioners rely on certain invoices that each of Integris, Eskridge, and the Milligans received relating to the performance of those respective personal services for them as a factor weighing in their favor in determining whether Smith Solutions in fact earned the income that it reported in its 2011 Form 1120S, its 2012 Form 1120S, and its 2013 Form 1120S.[17]  Those invoices contained the same caption.  The name "Smith Solutions, Inc." appeared at the top of each of those invoices.  Mr. Smith's name did not

---

[17]The record does not contain any invoices sent to, or received by, the Adamses relating to certain personal services that Mr. Smith performed for them.

**[\*33]** appear in the caption at the top of those invoices. As was true of the Hillcrest invoices relating to certain personal services that Ms. Smith performed for Hillcrest, we are unable to find on the basis of the invoices that each of Integris, Eskridge, and the Milligans received that each of Integris, Eskridge, and the Milligans recognized or understood that it was contracting with Smith Solutions for certain personal services of Mr. Smith, and not with Mr. Smith in his individual capacity. Nor are we able to find from those invoices that each of Integris, Eskridge, and the Milligans recognized or understood that Smith Solutions was exercising control over Mr. Smith with respect to the personal services that he performed for it.

Petitioners also rely on the Integris checks, the Eskridge checks, the Milligan checks, and the Adamses checks relating to the performance of respective personal services by Mr. Smith for them as a factor weighing in their favor in determining whether Smith Solutions in fact earned the income that it reported in its 2011 Form 1120S, its 2012 Form 1120S, and its 2013 Form 1120S. Although those checks establish that each of Integris, Eskridge, the Milligans, and the Adamses was aware of the existence of Smith Solutions, they do not establish that each of those persons recognized or understood that each was contracting with Smith Solutions for the performance of certain personal services by Mr. Smith.

[*34] We are not persuaded that each of Integris, Eskridge, the Milligans, and the Adamses made the checks that each of them had written payable to Smith Solutions because each considered Smith Solutions as (1) the contracting party for certain respective personal services that Mr. Smith performed for each of them, (2) the entity that exercised control over Mr. Smith with respect to the performance of those respective services, and (3) the entity that was entitled to compensation for those respective services. We believe that each of Integris, Eskridge, the Milligans, and the Adamses made the checks that each of them had written payable to Smith Solutions because Mr. Smith asked each of them to do so.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they did not earn the income that Smith Solutions reported as "[t]otal income" in each of its 2011 Form 1120S, 2012 Form 1120S, and 2013 Form 1120S.

We turn next to whether petitioners are required for each of their taxable years 2011, 2012, and 2013 to include in income a certain additional amount of income that respondent determined in the notice for each of those years on the basis of the bank deposits analyses in question. It is petitioners' position that they are not required to do so. In support of that position, petitioners argue that certain

**[\*35]** of the taxable deposits that the revenue agent determined on the basis of the bank deposits analyses in question are not taxable.

Before addressing petitioners' arguments regarding certain alleged non-taxable deposits that they maintain the revenue agent included in taxable deposits for each of their taxable years 2011, 2012, and 2013, we note that we examined the bank deposits analyses in question and considered the testimony of the revenue agent regarding those analyses, which we found to be credible. We conclude, as summarized below, that the revenue agent conducted the bank deposits analyses in question in accordance with applicable law. The revenue agent asked petitioners to provide her with any books or records that they maintained for Smith Solutions for the taxable years at issue. Petitioners informed the revenue agent that they did not have any books and records. Petitioners provided the revenue agent only with a redacted version of the bank records relating to the WEOKIE accounts for their taxable year 2011. The revenue agent then decided to use the bank deposits method in order to determine the amount of petitioners' taxable income for each of their taxable years 2011, 2012, and 2013. See Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978); see also Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989). In conducting the bank deposits analyses in question, the revenue agent was required to, and we find that she did, take into account any nontaxable source of a

[*36] deposit of which she had knowledge. See Clayton v. Commissioner, 102 T.C. 632, 645-646 (1994).

"A bank deposit is prima facie evidence of income and respondent need not prove a likely source of that income." Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Petitioners bear the burden of proving that respondent's determinations of income based on the bank deposits method are erroneous. See Clayton v. Commissioner, 102 T.C. at 645. Petitioners may satisfy that burden by establishing that the deposits that remain at issue are derived from a nontaxable source. See Nicholas v. Commissioner, 70 T.C. at 1064.

We address now petitioners' arguments regarding certain alleged nontaxable deposits that they maintain the revenue agent included in taxable deposits for each of their taxable years 2011, 2012, and 2013. With respect to their taxable year 2011, petitioners point to four such alleged nontaxable deposits (alleged 2011 nontaxable deposits). Petitioners claim that a $25,000 deposit into the S013 checking account in April 2011 was "from the proceeds of the sale of a vintage 1936 Ford that was owned by Petitioner wife's mother, Margaret Claborn." According to petitioners, Ms. Smith's mother "contracted Petitioners to sell * * * [the vehicle] for her", and after the sale of the vehicle Ms. Smith's mother "gifted the proceeds of the sale to the Petitioners." Petitioners claim that they "provided com-

[*37] plete documentation of this deposit to Appeals and to Respondent prior to trial during the pretrial conference", but were "denied the opportunity to stipulate this evidence by the Respondent".

Petitioners also contend that a $1,550 deposit into the S013 checking account in October 2011 was "from the proceeds of the sale of furniture from Ms. Claborn" and that "[t]hese proceeds were gifted by Ms. Claborn to Petitioners following the sale." With respect to that $1,550 deposit, petitioners also claim that they "provided complete explanation of this deposit to Appeals and to Respondent prior to trial during the pretrial conference" but were "denied the opportunity to stipulate to this evidence by the Respondent".

The last two alleged 2011 nontaxable deposits are two deposits of $136,000 and $900, respectively, into the COD account that were made on the same day on August 29, 2011. Petitioners claim that each of those alleged 2011 nontaxable deposits was a nontaxable transfer from one of their accounts into another of their accounts (interaccount transfer). In support of their claim, petitioners point to a bank statement for August 2011 which showed the following descriptions for the respective deposits into the COD account on August 29, 2011, of $136,000 and $900: "NEW ACCOUNT DEPOSIT TRANSFER--SMITH, SHEI" and "DEPOS-IT TRANSFER--SMITH, SHEILA C", respectively. With respect to the $136,000

[*38] deposit into the COD account, petitioners also contend that it is "not logical for a retired handyman, who normally had gross income of approximately $30,000 each year, to suddenly receive 4-5 times his annual income in one lump sum".

With respect to their taxable year 2012, petitioners point to one alleged nontaxable deposit (alleged 2012 nontaxable deposit). Petitioners claim that a $700 deposit into the S013 checking account in December 2012 consisted of "proceeds of the sale of furniture from Ms. Claborn following her death" and was "part of Petitioner wife's inheritance". Petitioners also claim that they "provided complete explanation of this deposit [$700 deposit into the S013 checking account] to Appeals and to Respondent prior to trial during the pretrial conference, but Petitioners were denied the opportunity to stipulate this evidence by the Respondent".

With respect to their taxable year 2013, petitioners maintain that respondent refused to stipulate certain "deposit records" for the period January 15 through December 31, 2013. According to petitioners, "[i]f the deposit records for all of 2013 had been correctly submitted and stipulated, they would show" that numerous deposits, albeit most of them relatively small in amount, which the revenue agent had included in taxable deposits for their taxable year 2013, were nontaxable

[*39] (alleged 2013 nontaxable deposits).[18]  (We shall sometimes refer collectively to the alleged 2011 nontaxable deposits, the alleged 2012 nontaxable deposits, and the alleged 2013 nontaxable deposits as petitioners' alleged nontaxable deposits.)

Petitioners rely almost exclusively on their contentions on brief, not on evidence in the record, to establish their claims regarding petitioners' alleged nontaxable deposits.  For example, petitioners do not point to or rely on any part of the record that in fact establishes their claims that the $136,000 deposit and the $900 deposit into the COD account on August 29, 2011, were interaccount transfers.  We acknowledge that the descriptions of the $136,000 and $900 deposits in the pertinent records of the WEOKIE accounts as "NEW ACCOUNT DEPOSIT

---

[18]As an illustration of the type of alleged 2013 nontaxable deposits, petitioners contend that the "deposit records" for the period in 2013 after January 14, 2013, that, according to petitioners, respondent refused to stipulate would demonstrate that $4,350 of a $14,263.03 deposit into the S013 checking account on January 16, 2013, was "Petitioner wife's proportionate amount from the sale of their [sic] mother's (Margaret Claborn) jewelry, silver, and scooter".  As further examples, petitioners claim that they reported as taxable income certain of the alleged 2013 nontaxable deposits and that respondent's inclusion of those deposits in petitioners' income for the years at issue would result in double taxation of the same income.  Two illustrations of this type of alleged 2013 nontaxable deposits are petitioners' contentions (1) that $50 of a $1,085.22 deposit into the S013 checking account in February 2013 was from "a Citibank dividend check" which petitioners claim they reported in the Schedule B, Interest and Ordinary Dividends, included with their 2013 return and (2) that $158.22 of the same $1,085.22 deposit into the S013 checking account was from "a Western Gas & Royalty check" which petitioners claim they reported in their 2013 Schedule E.

**[*40]** TRANSFER--SMITH, SHEI" and "DEPOSIT TRANSFER--SMITH,

SHEILA C", respectively, suggest that those deposits involved, inter alia, some

type of "transfer". We also acknowledge that it would be unusual for a handyman

like Mr. Smith and an office manager like Ms. Smith, who had no other source of

substantial income during the years at issue that is disclosed by the record in this

case, to deposit $136,000 in one transaction. However, none of the records of the

WEOKIE accounts or any other evidence in the record establishes that Mr. Smith

or Ms. Smith made a withdrawal of $136,000 and another withdrawal of $900

from one or more accounts that one or both of them maintained at one or more

financial institutions.[19] In this regard, we note that the record establishes that the

revenue agent excluded from total deposits as nontaxable in determining taxable

deposits under the bank deposits analyses in question a $25,000 deposit into the

COD account, which was also made on August 29, 2011, the date on which the

---

[19]Petitioners claim that the $136,000 and $900 deposits were transfers from "a personal account owned by Petitioner wife established one year prior to the first year of audit into a Certificate of Deposit owned jointly by Petitioners." Nothing in the record establishes the existence of a bank account or other depository account in the name of Ms. Smith, let alone that any such bank account or depository account was the source of the $136,000 deposit and the $900 deposit. Petitioners also claim that "[n]either of these deposits were cash deposits and the RA could have easily traced both back to transfers between the personal account of Petitioner wife * * * and Petitioners' joint accounts." We held above that petitioners are not allowed to look behind the notice.

**[*41]** $136,000 deposit and the $900 deposit were made into that account. The description of that $25,000 deposit in the pertinent records of the WEOKIE accounts was "DEPOSIT TRANSFER--SMITH, RONNIE J". Unlike the $136,000 deposit and the $900 deposit, however, the record establishes that petitioners withdrew $25,000 from the S013 checking account on the same day on which they made that $25,000 deposit into the COD account.

On the record before us, we find that petitioners have failed to carry their burden of establishing that the source of the $136,000 deposit and the source of the $900 deposit were one or more accounts that one or both of them maintained at one or more financial institutions and that consequently each of those deposits was an interaccount transfer.

Another example of petitioners' attempts to have us sustain without support in the record their contentions that certain of the taxable deposits that the revenue agent determined under the bank deposits analyses in question are not taxable relates to their claim that respondent refused to stipulate certain "deposit records" for the period January 15 through December 31, 2013. Even if we were to accept, which we do not, petitioners' contention that respondent refused to stipulate certain "deposit records" for the period January 15 through December 31, 2013, petitioners do not provide any reasonable explanation as to why they did not offer

[*42] those "deposit records" into evidence at the trial in this case.[20] And we cannot fathom any reasonable explanation for the failure of petitioners, who have the burden of proof on the issues presented, to do so unless, of course, they do not have any such records.

A final illustration of petitioners' attempts to have us sustain without support in the record their contentions that certain of the taxable deposits that the revenue agent determined under the bank deposits analyses in question are not taxable concerns petitioners' claims that certain of their alleged nontaxable deposits related to deposits from an inheritance that Ms. Smith received or to deposits that they reported as income. The record simply does not establish those claims.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are not required to include in income for the respective years at issue petitioners' alleged nontaxable deposits. On that record before us, we find that petitioners have failed to carry their burden of establishing that they are not required to include in in-

---

[20]We reject as highly questionable petitioners' assertion on brief that "[d]ue to some confusion leading up to and at trial, the Petitioners did not have adequate opportunity to present extensive evidence at trial clearly outlining the non-taxable deposits".

[*43] come for each of the years at issue a certain additional amount of income that respondent determined in the notice for each of those years.

We turn now to whether petitioners are entitled for each of their taxable years 2011, 2012, and 2013 to deduct certain expenses that they contend were paid in performing their respective personal services during each of those years. Deductions are a matter of legislative grace, and petitioners bear the burden of proving entitlement to any deductions claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). The Code and the regulations thereunder required petitioners to maintain records sufficient to establish the amount of any deductions claimed. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Moreover, section 162(a) generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. In addition, for certain kinds of expenses that are otherwise deductible under section 162(a), such as those for "listed property", as defined in section 280F(d)(4), a taxpayer must satisfy certain additional substantiation requirements set forth in section 274(d) before such expenses will be allowed as deductions.

Petitioners rely upon certain bank statements, certain credit card statements, and certain vehicle records that are in the record to establish that they are entitled to deduct certain expenses that they contend were paid in performing their respec-

[*44] tive personal services during each of the years at issue. The documents on which petitioners rely do not establish the respective types or the respective amounts of the various expenses for which petitioners are claiming deductions. Nor do those documents establish that any such claimed expenses are ordinary and necessary expenses that petitioners paid or incurred during one or more of the years at issue in performing their respective personal services.

On the record before us, we find that petitioners have failed to carry their burden of establishing that certain expenses for which they are claiming deductions for each of the years at issue are ordinary and necessary expenses that they paid or incurred during one or more of those years at issue in performing their respective personal services during each of those years. On that record, we also find that, even if petitioners had carried that burden, they have failed to carry their burden of establishing that certain kinds of expenses for which they are claiming deductions for each of the years at issue, such as those for "listed property", as defined in section 280F(d)(4), satisfy certain additional requirements in section 274(d).

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are entitled for each of their taxable years 2011, 2012, and 2013 to deduct certain expenses

**[*45]** that they contend were paid in performing their respective personal services during each of those years.

We turn now to the last issue presented, namely, whether petitioners are entitled for their taxable year 2011 to deduct $21,940 with respect to a claimed net operating loss carryover (sometimes, claimed NOL deduction). Section 172(a) allows a deduction for a net operating loss for the taxable year in an amount equal to the sum of (1) the net operating loss carryovers to such year and (2) the net operating loss carrybacks to such year. A net operating loss is defined as the excess of deductions allowed by chapter 1 of the Code over the gross income, subject to certain modifications in section 172(d).[21] See sec. 172(c).

In support of their position that they are entitled for their taxable year 2011 to their claimed NOL deduction, petitioners argue that "[r]espondent erred in disallowing the Petitioners' Net Operating Loss in the amount of $21,940 reported on Petitioners' F1040 for tax year 2011 since RA [the revenue agent] never exam-ined tax returns and records and never gave Petitioners an opportunity to substan-tiate that amount."

---

[21]One of the modifications in sec. 172(d)(1) is that no net operating loss deduction is to be allowed in calculating the amount of a net operating loss.

[*46] We held above that petitioners, not respondent, have the burden of proof on each of the issues presented. Petitioners did not offer any evidence at the trial in this case that establishes that they are entitled for their taxable year 2011 to their claimed NOL deduction.[22]

Based upon our examination of the entire record before us, we hold that petitioners have failed to carry their burden of establishing that they are entitled for their taxable year 2011 to deduct $21,940 with respect to a claimed net operating loss carryover.

We have considered all of the parties' respective contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the parties' concessions,

Decision will be entered

under Rule 155.

---

[22]Petitioners did not even offer into evidence any tax return(s) that they had filed for a taxable year before the years at issue. Even if they had, we have consistently held that a taxpayer is not entitled to a deduction claimed in a tax return that the taxpayer has filed merely because of the filing of the return. See, e.g., Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979).