FILED
United States Court of Appeals
Tenth Circuit

June 2, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 12-4104

KEVIN HARTSHORN, conducting
business through the Church of
Compassionate Service,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:10-CV-00638-CW)**

John J.E. Markham, II, of Markham & Read, Boston, Massachusetts, for Defendant -
Appellant.

Regina S. Moriarty, Attorney, Tax Division, Department of Justice, Washington, D.C.
(David Barlow, United States Attorney, Salt Lake City, Utah, of Counsel; Kathryn
Keneally, Assistant Attorney General, and Teresa E. McLaughlin, Attorney, Tax
Division, Department of Justice, Washington D.C., with her on the brief) for Plaintiff -
Appellee.

Before **KELLY**, **McKAY**, and **O'BRIEN**, Circuit Judges.

**McKAY**, Circuit Judge.

Defendant Kevin Hartshorn appeals the district court's issuance of an injunction

against him under 26 U.S.C. § 7408, arguing the court erred in concluding he promoted an abusive tax shelter in violation of 26 U.S.C. § 6700. The district court agreed with the government that Defendant was promoting abusive tax shelters through his church, the Church of Compassionate Service, and particularly through his representations that individuals who took vows of poverty and obedience and became ministers of his church would not be required to pay taxes on income they earned and assigned to the church. The court accordingly granted summary judgment in favor of the government and issued an injunction prohibiting Defendant from promoting or selling "the use of church-based tax-fraud schemes." (Appellant's App. at 1140.) On appeal, Defendant contends we should reverse the district court's summary judgment decision because (1) Defendant's statements regarding the tax benefits for vow-of-poverty ministers were correct, and (2) if any of his statements were false or fraudulent, he did not know or have reason to know of this fact.

## BACKGROUND

Defendant organized and was appointed head minister of the Church of Compassionate Service in 2004. At the time of the proceedings below, the church had approximately fifty active ministers.[1] To become a minister, an individual is required to take a vow of obedience and a vow of poverty. Upon taking the vow of poverty, ministers transfer title to all of their property to the church. They also assign to the

---

[1] It is not clear from the record whether the church has any lay members.

church all income that is earned as part of their normal employment, either endorsing their employment checks in favor of the church or directing their employers to deposit their earnings directly into various church accounts. The ministers' homes, now owned by the church, are designated as parsonages, and their mortgages and other expenses are paid for with church funds. The church issues ministers a debit card on an individual church account, and each minister's family submits a regular "Request for Ministry Funding" to fund their ministry bank accounts.[2] (*See id.* at 606, 756-61.) While the church formally maintains the right to refuse payment of these requests, Defendant presented no evidence of any particular request that was refused. According to internal church documents, "10% will be withheld on all funds flowing through the Order, with 90% being available for local ministry funding." (*Id.* at 240.) Defendant testified that the church's "policy [of trying] to make 90 percent available to fund ministries for their compassionate service projects [is] not tied to how much money they make." (*Id.* at 153.) However, ministers who were deposed in the course of this litigation indicated that it was their understanding they would "get back 90 percent of whatever funds [they] generate[d] for the church." (*Id.* at 109; *see also id.* at 124.)

---

[2] An individual who did administrative work for the church testified that "a ministry usually consists of a couple people, a husband and wife and/or a family would be involved with ministry work in general." (*Id.* at 177.) Thus, the church's approximately fifty ministers were organized into approximately thirty-four ministries. (*Id.*) According to the evidence in the record, when a married couple submitted ministry funding requests for their family's ministry, they submitted a single form requesting funding for accounts in each minister's name.

As the head minister of the Church of Compassionate Service, Defendant has assisted individuals in executing vows of poverty and transferring their property to the church, and he has made representations to them about the tax consequences of doing so. He has told ministers they need not pay taxes on money they earn that is assigned to the church pursuant to a vow of poverty. The Minister's Handbook, which Defendant drafted, states:

> When ministers of the [Compassionate] Order [of Service] take the Vow of Poverty, even the IRS recognizes that they have no income and that any income that they would receive belongs to the religious order. If a minister under a Vow of Poverty has no income, nor assets, then it would be futile for someone to sue them. If a minister has no income, then there is no income tax.

(*Id.* at 563.) In a section covering "Speaking to Government Authorities," the Minister's Handbook states the government officials "may ask technical legal questions" that should be referred to church authorities rather than answered by individual ministers. (*Id.* at 592.) Ministers are "directed" "not [to] chat or discuss anything," "not [to] volunteer any information or provide them with any information," and "not [to] invite them into the parsonage." (*Id.* at 593.) The Minister's Handbook also contains a table of "Church Vocabulary" for ministers to use in speaking with others, using, for instance, the phrase "Church/Order funds" instead of "Income," the phrase "By assignment, as a Vow of Poverty Minister" instead of "My Business/My job," and the phrase "the assigned boat for use by the ministry" instead of "My Boat." (*Id.* at 590.)

In support of its motion for summary judgment, the government provided details

-4-

about various church ministers but relied mainly on one individual, a minister named Bruce Calkins. On appeal, we likewise focus on Mr. Calkins' situation. As part of the process of applying to become a church minister, Mr. Calkins filled out an information sheet in which he provided Defendant with information about his job, employer, average income, net worth, bank accounts, and past financial history. The information sheet included a section asking for the "Company(s) you are involved with and position(s) you hold: (Please include ALL income-producing activities)." (*Id.* at 218.) Mr. Calkins filled out this section with the following information: "Kaiser Permanente Medical Center, San Diego, CA: Histotechnologist[;] USANA Health Sciences, Salt Lake City, UT: Independent Associate/Distributor of nutritional supplements and skin care products. (network marketing business)." (*Id.*) Mr. Calkins was accepted as a minister and issued written vows of obedience and poverty, which he signed. He was also issued an "Agency Assignment" that essentially instructed him to continue doing what he was already doing:

> [T]o enable you to fulfill your responsibilities as agent of the Order, you are hereby instructed to pursue work in histotechnology at Kaiser Permanente Medical Center, San Diego, CA as a Histotechnologist and as an Independent Associate/Distributor of nutritional supplements and skin care products produced by USANA Health Sciences . . . for the financial support of the Order. Further, funds generated from the results of your labors are not to be construed as income or financial gain to you personally, yet will be the financial blessings of the Compassionate Order of Service.

(*Id.* at 225.)

After becoming a minister, Mr. Calkins assigned his pay from Kaiser Permanente to the church and directed that his paycheck be deposited directly into a church account.

-5-

Mr. Calkins continues to receive employee benefits from Kaiser Permanente, including health care, sick leave, and vacation days.  Mr. Calkins testified that the church does not exercise any control over the work he performs for Kaiser Permanente; rather, his work is directed by Kaiser Permanente employees.  He testified that roughly ninety percent of the money he earns and turns over to the church is available "to provide for expenses of [his] ministry" (*id.* at 107) and there "hasn't been an issue" with him being unable to buy something he wanted after taking his vow of poverty (*id.* at 106).  Mr. Calkins last filed a federal income tax return in 2000.

Taking the facts in the light most favorable to Defendant, the district court concluded that Mr. Calkins' employment with Kaiser Permanente resulted in taxable income.  The court accordingly concluded that Defendant made false or fraudulent statements when he told Mr. Calkins he was exempt from income tax obligations due to his relationship with the church.  The court also concluded that Defendant knew or should have known of the falsity of his statements, given the fact that similar tax avoidance theories have been consistently rejected by the Internal Revenue Service and federal courts.  The court further concluded Defendant's false or fraudulent statements were material and an injunction was necessary to prevent the recurrence of this conduct, and the court accordingly granted the government's motion for summary judgment as to the necessity of an injunction under 26 U.S.C. § 7408.[3]  The court then issued an injunction

---

[3] The court rejected the government's request for additional injunctive relief under 26 U.S.C. § 7402, holding that it would entertain such a request only if Defendant

prohibiting Defendant from promoting or selling "the use of church-based tax-fraud schemes." (*Id.* at 1140.) On appeal, Defendant challenges the district court's legal conclusion that an injunction was necessary but does not otherwise challenge the scope of injunctive relief ordered by the district court. Specifically, Defendant raises two arguments regarding the district court's summary judgment order: he argues (1) his statements to Mr. Calkins and other ministers were not false or fraudulent and (2) even if they were, he did not know or have reason to know of this fact.

## DISCUSSION

While we typically "review a district court's grant of an injunction for abuse of discretion," "[w]e review de novo a summary judgment which serves as a basis for an injunction." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1016 (10th Cir. 1998).

For injunctive relief to be warranted under § 7408, the government was required to prove by a preponderance of the evidence that (1) Defendant organized an entity, plan, or arrangement; (2) he made false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) he knew or had reason to know that the statements were false or fraudulent; (4) the false or fraudulent statements pertained to a material matter; and (5) an injunction was necessary to prevent recurrence of this conduct. *See United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000). In this

---

continued to promote the same tax avoidance arrangement following the court's decision. The court's denial of an injunction under § 7402 is not at issue in this appeal.

appeal, the only elements in dispute are the second and third elements—whether Defendant's statements about the tax benefits relating to vow-of-poverty ministers were false or fraudulent, and whether Defendant knew or had reason to know of this fact. Thus, the main question we must decide in this case is whether Church of Compassionate Service ministers like Mr. Calkins are required to pay federal income taxes on income they earn in normal employment and assign to the Church of Compassionate Service.

To resolve this question, we must first consider whether a minister's income is tax exempt only if he receives it as an agent of the church or whether, as Defendant argues, it is sufficient that a minister assigns earnings to his church pursuant to a vow of poverty. All of the circuit courts that have considered this issue have concluded a minister must earn income as an agent of his church in order for his earnings to be tax exempt. *See, e.g.*, *Page v. Comm'r*, 823 F.2d 1263, 1270-71 (8th Cir. 1987); *Schuster v. Comm'r*, 800 F.2d 672, 676-78 (7th Cir. 1986); *Pollard v. Comm'r*, 786 F.2d 1063, 1065-66 (11th Cir. 1986); *Fogarty v. United States*, 780 F.2d 1005, 1012 (Fed. Cir. 1986); *Mone v. Comm'r*, 774 F.2d 570, 573-74 (2d Cir. 1985); *see also In re Von Kiel*, 461 B.R. 323, 333 (Bankr. E.D. Penn. 2012) (collecting cases and noting that "[a]ll eight Courts of Appeal . . . to have addressed the issue are in agreement:  Attempts to avoid personal tax liability based on vows of poverty without proof that some agency relationship exists between the entity providing the wages and the church or religious order requiring the vow of poverty are simply unavailing").  As the Eighth Circuit has explained:

A basic principle of tax law is that income is taxable to the one who earns

it.  It is likewise basic that a taxpayer is not relieved of his obligation to pay income tax on any income he earns when he transfers it or assigns it to another person or entity.  If, however, one receives income as an agent for a principal, it is the income of the principal and not that of the agent.  Specifically, if a member of a religious order earns income as an agent of and on behalf of the order, and gives that money to the order pursuant to his vow of poverty, that sum becomes income to the order and the individual is not taxed on it.  Conversely, if a member of a religious order earns income in his individual capacity and gives the money to the order pursuant to his vow of poverty, that sum is income to him and is subject to federal income tax.

*Page*, 823 F.2d at 1270 (citations omitted).

Notwithstanding this weight of authority, Defendant argues an agency relationship is not required based on an IRS publication and a few regulations from Title 26, Part 31 of the Code of Federal Regulations.  The publication he cites, IRS Publication 517, provides:

> **Earnings—Members of Religious Orders**
> Your earnings may be exempt from both income tax and [self-employment] tax if you are a member of a religious order who:
> - Has taken a vow of poverty,
> - Receives earnings for services *performed as an agent of the order* and in the exercise of duties required by the order, and
> - Renounces the earnings and gives them to the order.

IRS Pub. No. 517, Social Security and Other Information for Members of the Clergy and Religious Workers (2012),[4] at 9 (emphasis added).  This publication is thus in accordance with the courts' rulings—it provides tax-exempt status to a minister's earnings only when the minister earns the income as an agent of the church and not in his individual capacity.

---

[4] This publication existed in much the same format when Defendant organized the church in 2004.

As for the federal regulations Defendant relies on, 26 C.F.R. §§ 31.3121(b)(8)-1 and 31.3401(a)(9)-1, these regulations do not define the federal income tax rules for a minister's earnings. Rather, 26 C.F.R. § 31.3121(b)(8)-1 relates only to employee and employer taxes under the Federal Insurance Contributions Act—i.e., Social Security and Medicare taxes. *See* 26 C.F.R. § 31.0-3(a). And 26 C.F.R. § 31.3401(a)(9)-1 only defines the types of earnings that are "excepted from wages" and thus not subject to withholding at the source under 26 U.S.C. § 3402. *See* 26 C.F.R. § 31.3401(a)(9)-1(a).[5] As explained in more detail in IRS Publication 517, a minister's earnings may be subject to special rules, depending on various circumstances that are not pertinent to this appeal. Thus, for instance, in some circumstances a minister's earnings may be covered under the Self-Employment Contributions Act rather than FICA, or a minister may be required to make estimated income tax payments throughout the year because his salary is not withheld at the source. However, regardless of whether or not an agency relationship is required to trigger the regulations cited by Defendant, these regulations do nothing to change the general rule that a minister's earnings are only tax exempt if (1) the minister

---

[5] Defendant contends that if a minister's earnings are not considered "wages" under 26 C.F.R. § 31.3401(a)(9)-1, they cannot be considered "income" for federal income tax purposes, since they do not fall under any of the other specific types of income mentioned in 26 C.F.R. § 1.61-2(a). We find this argument unpersuasive. First, we note that Section 31.3401(a)(9)-1 only describes when a minister's earnings will be "excepted from wages" for purposes of withholding requirements, not for all taxation purposes. Second, it is clear that "[g]ross income means all income from whatever source derived, unless excluded by law. . . . Section 61 lists the more common items of gross income for purposes of illustration. . . . Gross income, however, is not limited to the items so enumerated." 26 C.F.R. § 1.61-1(a).

has taken a vow of poverty, (2) the minister acts as an agent of the church and in the exercise of duties required by the church, and (3) the minister renounces the earnings and gives them to the church.

Although our sister circuits all agree it is necessary for a minister to act as an agent of the church for his earnings to be tax-exempt, they have applied different tests to determine when this agency requirement is satisfied. Some courts require taxpayers to "show that a contractual relationship existed between their secular employers and the religious order," *Mone*, 774 F.2d at 573, while others apply a more flexible test that views a contractual relationship as only one factor in determining whether there is an agency relationship, *see Fogarty*, 780 F.2d at 1012. We conclude the flexible approach is most appropriate. Under this approach, courts may consider various factors pertinent to the relationships between the religious order and the minister, between the minister and the third-party employer, and between the employer and the order. *See Fogarty*, 780 F.2d at 1012 (explaining that relevant factors may include "the degree of control exercised by the order over the member"; "ownership rights between member and order"; "the purposes or mission of the order, and the type of work performed by the member vis-a-vis those purposes or mission"; "dealings between the member and the third-party employer," including "circumstances surrounding job inquiries and interviews, and control or supervision exercised by the employer"; and "dealings between the employer and order," including the possible existence of a contractual arrangement between the third-party employer and the order). Because this approach is flexible, "[t]he presence of unique

-11-

facts in each case will inevitably lead the court to place more emphasis on one or more factors and less on others." *Id.*[6]

Applying this flexible test to Mr. Calkins' employment with Kaiser Permanente, we first conclude the relationship between the church and Mr. Calkins provides little evidence to support the conclusion that Mr. Calkins acted as an agent of the church in this employment. Without providing any specifics, Defendant testified he "direct[ed]" Mr. Calkins "[i]n his agency assignment and in our meetings together dealing with his ministry and the needs of the ministry, where he's at, how are things going." (Appellant's App. at 158.) However, with the exception of Mr. Calkins asking Kaiser Permanente to transmit his earnings to a church account instead of a personal account, there is no evidence that Mr. Calkins took any particular actions—much less actions relating to his employment with Kaiser Permanente—as a result of his relationship with the church. In arguing that we should treat Mr. Calkins as an agent of the church in his employment with Kaiser Permanente, Defendant contends we should give conclusive weight to the

_____

[6] We note that *Fogarty* and other cases applying the flexible test, most notably the Seventh Circuit's decision in *Schuster*, have been criticized for disregarding facts favorable to the minister and for applying a narrow definition of agency that sweeps up bona fide vow-of-poverty ministers along with bogus ones. *See, e.g.*, J. Timothy Phillips, *But Reverend, Why Does Your Baptismal Font Have a Diving Board? Equitable Treatment for Vows of Poverty Under the Federal Income Tax*, 44 Wash. & Lee L. Rev. 19, 40-41 (1987); Wanda F. Reed, *Revenue Ruling 77-290—Recent Interpretations of Agency Law Inequitably Taxes Members of Religious Orders*, 23 Val. U. L. Rev. 179, 199-203 (1988). Although we apply the more flexible *Fogarty* test here, we do not necessarily endorse our sister circuits' application of this test to the facts in the cases before them.

-12-

purported "agency assignment" the church issued to Mr. Calkins. However, this document bears little, if any, persuasive weight. As a comparison with Mr. Calkins' pre-acceptance information sheet makes clear, the agency assignment simply directed Mr. Calkins to continue in his present employment, and nothing in the record suggests the agency assignment should be treated as anything other than illusory. *See Page*, 823 F.2d at 1270-71 (rejecting argument that ministers were agents of their church because they were directed to secure secular employment: "even though appellants were meticulous in organizing and operating their churches, giving rise to the appearance that their religious doctrine required them to obtain secular employment, and they did not control the money purportedly turned over to the churches, the fact remains that appellants have failed to meet the agency standard").

Nor does Mr. Calkins' relationship with the third-party employer weigh in favor of finding him to be acting as an agent of the church. Mr. Calkins was already employed by Kaiser Permanente when he became a minister of the church, and there is no evidence that anything about his employment—with the sole exception of the payee on his employment checks—changed as a result of his ministry. Mr. Calkins' testimony reflects that he simply continued as usual with his employment with Kaiser Permanente and that the church has never exercised any control over the work he performed there. Rather, his work at Kaiser Permanente is directed by Kaiser Permanente employees—the "senior or lead tech" who "does the daily scheduling," an administrative supervisor, and the pathologist. (Appellant's App. at 107); *see also Fogarty*, 780 F.2d at 1012 (noting that

factors relevant to the dealings between the member and the third-party employer include "circumstances surrounding job inquiries and interviews, and control or supervision exercised by the employer").

Finally, the relationship between the church and Kaiser Permanente does not support the conclusion that Mr. Calkins was acting as the church's agent. At Mr. Calkins' direction, Kaiser Permanente deposited Mr. Calkins' earnings into a church-owned account, but there otherwise were absolutely no dealings between the church and the third-party employer. *Cf. Schuster*, 800 F.2d at 682 (Korner, J., dissenting) (arguing that a nun should have been treated as an agent for her religious order where, among other things, the order "was intimately involved in negotiating for and approving [her] job" with a health clinic).

Considering all of these factors as a whole, we are persuaded that Mr. Calkins was not acting as an agent of the church in his employment with Kaiser Permanente. We accordingly agree with the district court that Defendant's representations to Mr. Calkins regarding the tax consequences of becoming a minister of the church were false or fraudulent.

We turn then to the question of whether Defendant knew or should have known his representations were false or fraudulent. Defendant argues he reasonably relied on the IRS publication and regulations discussed above to determine that vow-of-poverty ministers of the Church of Compassionate Service did not have to pay income taxes on earnings they assigned to the church. Defendant dismisses as inapposite all of the circuit

court cases holding that a true agency relationship is required for a minister's earnings to be tax exempt, arguing that (1) these cases involved obvious shams and (2) the ministers in those cases had more control over their wages because, unlike Mr. Calkins, they received employment checks and then turned them over to their respective religious orders, rather than requesting that their salaries be paid directly into church accounts.

We find none of these arguments persuasive. The test for injunctive relief under § 7408 is satisfied if the defendant had reason to know his statements were false or fraudulent, regardless of what he actually knew or believed. *See Estate Pres. Servs.*, 202 F.3d at 1098; *see also* 26 U.S.C. § 6700(a)(2)(A). And we conclude that, whether or not Defendant actually knew his purported interpretation of federal tax law was incorrect, "a reasonable person in [his] subjective position would have discovered" the falsity of his representations. *Estate Pres. Servs.*, 202 F.3d at 1103 (internal quotation marks and alterations omitted).

As discussed above, the IRS publication Defendant relies on is actually in accordance with the pertinent case law, while the regulations he cites do not address the question of when a minister's earnings will be exempted from federal income tax requirements. Defendant's attempt to distinguish the pertinent cases is likewise unavailing. First, while some of the relevant cases involve obvious shams, others do not. *See, e.g.*, *Fogarty*, 780 F.2d at 1007, 1013 (holding a Jesuit priest was required to pay income taxes on the salary he received for teaching religious courses at a university); *Schuster*, 800 F.2d at 676-79 (holding a Roman Catholic nun was required to pay income

taxes on wages she earned at a health clinic).  Even legitimate ministers' earnings are subject to federal income taxes if the minister was acting in his individual capacity, rather than as an agent of the church.  *See Pollard*, 786 F.2d at 1066 ("[T]he . . . Church's religious bona fides are irrelevant—it is the purported assignment of income here that is a 'sham,' and for tax rather than religious reasons.").  Second, we conclude that a reasonable person in Defendant's situation would not believe Mr. Calkins' direction for his employer to deposit his salary into church accounts was effective to exempt his earnings from taxation.  Under the anticipatory assignment of income doctrine, when income is assigned to a third party before the moment of receipt, the income is still considered earned by the assignor if he "retains dominion over the income-generating asset."  *Comm'r v. Banks*, 543 U.S. 426, 434 (2005).  And here, Mr. Calkins retained control over the income-generating asset because he had the unfettered ability to direct Kaiser Permanente to deposit his salary into his own account instead of the church's.[7]

---

[7] Defendant appears to argue that the anticipatory assignment of income doctrine should be inapplicable to cases involving vow-of-poverty ministers.  Since ministers cannot be forced to adhere to religious vows, he argues, then a minister will always have the legal right to renounce his vow of poverty and begin keeping his money for himself, and thus "no Vow of Poverty arrangement would ever work" if the anticipatory assignment of income doctrine is applied.  (Appellant's Reply Br. at 15.)  However, the anticipatory assignment of income doctrine does not hold that a minister's earnings are always taxable if the minister has the ultimate power to change his employment or financial arrangements.  If a minister actually earns money as an agent of his church, these earnings will be tax-exempt regardless of whether the earnings are directly given to the church or are signed over by the minister.  Where, however, a minister earns income in his individual capacity, the anticipatory assignment of income doctrine prevents him from avoiding the tax liability he would otherwise incur by preemptively assigning the income to the religious order before he receives it.  In other words, this doctrine targets

Defendant suggests Mr. Calkins did not actually have control over the disposition of his salary because he could only stop the assignment of income to his church if he decided to ignore his vow of poverty. However, the ministers in other cases who received a salary and then assigned it to their respective religious orders would likewise have needed to ignore their vows of poverty in order to keep the money. Thus, Defendant has not cited to a meaningful distinction between Mr. Calkins' situation and other cases in which ministers have been required to pay income taxes on their earnings. Based on all of these pertinent cases, as well as the relevant IRS rulings and publications, we conclude a reasonable person in Defendant's position would know that his representations regarding the tax consequences of Mr. Calkins' actions were false.

## CONCLUSION

For the foregoing reasons, we conclude that Defendant made false representations to Mr. Calkins about the tax consequences of his actions and that he knew or should have known of the falsity of his representations. Defendant does not challenge the other elements for injunctive relief under § 7408. We accordingly **AFFIRM** the district court's summary judgment ruling and order of injunctive relief.

---

individuals' attempts to avoid tax liability by bookkeeping arrangements; it does not alter existing tax rules establishing when earnings will be tax-exempt.

12-4104, *U.S. v. Hartshorn*

**O'BRIEN**, J. concurring in the result and, in part, concurring in the opinion.

Without qualification I concur in the result. I concur in the opinion in all respects but one. I part company with the majority as to the appropriate test for determining an agency relationship. The majority has chosen the flexible approach espoused by *Fogarty v. United States*, 780 F.2d 1005 (Fed. Cir. 1986); *accord Schuster v. Comm'r*, 800 F.2d 672, 678 (7th Cir. 1986). The *Fogarty* approach is insufficiently rigorous because it facilitates the manipulations of charlatans and tax evaders.

The rule announced by the Second Circuit in *Mone v. Comm'r*, 774 F.2d 570, 573 (2d Cir. 1985) is far superior:

> To prove assignment of income on an agency theory, the taxpayers bear a double burden: they must show that a contractual relationship existed between their secular employers and the religious order, and that the religious order controlled or restricted the taxpayers' use of the money purportedly turned over to the order. *See Stephenson v. Commissioner,* 79 T.C. 995, 1001 (1982), *aff'd per curiam,* 748 F.2d 331 (6th Cir.1984); *White v. Commissioner,* 41 T.C.M. (CCH) 1180, 1183 (1981); *Kelley v. Commissioner,* 62 T.C. 131 (1974).

*See also Page v. Comm'r*, 823 F.2d 1263, 1270-71 (8th Cir. 1987) (adopting the *Mone* test).

Paying income taxes is a statutory duty; some also consider it a civic duty. Few gladly pay, but most faithfully do. Faithful compliance is tested, sometimes beyond elastic limits, by the siren's song of the unscrupulous – pay 10% of your income to the "church" and completely avoid the much higher extractions

demanded by the taxman AND do so without changing your life circumstances in any significant manner.  Sounds great!  To the unprincipled or the naïve, it is precisely what the doctor ordered.  It is also illegal.

The *Mone* approach to recognizing a claimed agency agreement requires an explicit agreement between the "minister" and the "church."  Properly done, and preferably in writing, the agreement would clearly set forth the correlative rights and duties of the contracting parties, narrowing wriggle room for the charlatans and foreclosing the "I didn't know" or "nobody told me" excuses of the conveniently ignorant.  Strict standards facilitate the collection of taxes properly due without significantly burdening legitimate agency agreements.

The *Mone* approach to enforceability of such agreements should be extended by also requiring an explicit agreement, preferably written, between the "church" and the "minister's" employer detailing its particulars.  At a minimum it would, of necessity, make clear that the "church," rather than the employee, would be responsible for negotiating the employee's assignments, pay, benefits, opportunity for advancements, and other conditions of employment.  It would also make clear that the employment agreement could be terminated or changed only by agreement between the "church" and the employer.