**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 16, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

UNITED PARK CITY MINES
COMPANY; TALISKER FINANCE
LLC,

     Defendants - Appellants.

No. 18-4110
(D.C. No. 2:17-CV-00482-DB)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **LUCERO, HOLMES**, and **MORITZ**, Circuit Judges.


Defendants-Appellants United Park City Mines Company ("UPCM") and

Talisker Finance LLC ("Talisker") appeal from the district court's order denying

their motion for summary judgment, granting plaintiff-appellant United States's

motion for partial summary judgment, and directing UPCM and Talisker to

comply with the information requests issued by the Environmental Protection

---

[*]     This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent Federal Rule of Appellate Procedure
32.1 and 10th Circuit Rule 32.1.

Agency ("EPA") pursuant to 42 U.S.C. § 9604(e). Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we **affirm** the district court's order.

## I

## A

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–75, "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994)). The statute was "designed to promote the '"timely cleanup of hazardous waste sites"' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (quoting *Consol. Edison Co. of N.Y. v. UGI Util., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)).

To achieve this goal, the statute authorizes the federal government to wield several broad and varied powers. For example, the President may "enter into an agreement with any person (including the owner or operator of the facility from which a release or substantial threat of release emanates, or any other potentially responsible person), to perform any response action . . . if the President

determines that such action will be done properly by such person."[1] 42 U.S.C. § 9622(a). CERCLA also authorizes the President to direct federal agencies to undertake certain investigative actions. Federal officials may seek to obtain information "for the purposes of determining the need for response, or choosing or taking any response action under [CERCLA], or otherwise enforcing the provisions of [CERCLA]." *Id*. § 9604(e)(1). Under CERCLA, the President and duly designated representatives, including the EPA, may:

> require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information or documents relating to such matter:
>
> . . . .
>
> (C) Information relating to the ability of a person to pay for or to perform a cleanup.

*Id.* § 9604(e)(2). Here, "person" includes corporations and other business organizations. *Id.* § 9601(21).

If "consent is not granted" with respect to such information requests, the district court, upon the filing of a civil action by the government, may "direct compliance with the requests . . . to provide such information or documents unless under the circumstances of the case the demand for information or documents is

---

[1]     A "response" or "response action" is a term of art in CERCLA that "covers a broad array of cleanup activities." *Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1116 (9th Cir. 2017).

arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law." *Id.* § 9604(e)(5)(A), (B)(ii).

**B**

In the mid-1980s, the EPA began investigating the Richardson Flat Tailings Site, an area contaminated with hazardous substances that is downstream from UPCM's former operations near Park City, Utah. To evaluate options to clean up the site, the EPA divided the location into four different "operable units" ("OUs"), and indicated that UPCM could be potentially responsible for cleanup efforts at OU1, OU2, and OU3 (but not OU4).

In 2000, the EPA and UPCM entered into an administrative order on consent ("2000 AOC"), which required UPCM to conduct a remedial investigation and feasibility study for OU1. UPCM completed that study in 2004. In 2007, the EPA and UPCM entered into a consent decree requiring UPCM to implement a remedial action that the EPA selected for OU1 and to pay the EPA's future response costs for OU1. The parties dispute whether the remedy for OU1 remains unfinished.

In 2014, the EPA and UPCM entered into an administrative order on consent for OU2 and OU3 ("2014 AOC"). That agreement requires UPCM to perform an engineering evaluation and cost analysis ("EE/CA"), implement the

4

response actions the EPA selects for the units, and pay the EPA's future response costs. The EPA later took over the EE/CA, alleging that UPCM was failing to timely and adequately perform its work and make its payments as required by the 2014 AOC.

In 2014, Talisker Finance, LLC ("Talisker") defaulted on a loan to a third party for which UPCM had pledged collateral. The lender thereafter initiated a foreclosure action and acquired some UPCM properties. Significantly, in 2003, UPCM was acquired by a company that was allegedly affiliated with Talisker.

In January 2016, the EPA sent UPCM a letter pursuant to 42 U.S.C. § 9604(e) requesting information about UPCM's financial and corporate history, including information relating to UPCM's acquisition in 2003 and any transfers of assets or liabilities between UPCM and Talisker. UPCM did not respond to some of these requests—specifically, the ones that related to its ties with Talisker—on the grounds that the requests were outside the scope of § 9604(e).

In September 2016, the EPA sent a letter to Talisker pursuant to § 9604(e) requesting information about, among other things, Talisker's corporate history and its affiliated companies. Talisker objected to the request—specifically as it related to providing a list of affiliated companies—again, on the grounds that the request was outside the scope of § 9604(e).

5

In May 2017, the government filed a complaint against UPCM and Talisker ("the Defendants") seeking to enforce the EPA's information requests. The complaint alleged that both information requests relate to UPCM's ability "to pay for or to perform a cleanup" at OU2 and OU3. 42 U.S.C. § 9604(e)(2)(C). Defendants filed a motion for summary judgment, and the government in turn filed a cross-motion for partial summary judgment.

In June 2018, the district court issued an order denying summary judgment to the Defendants, granting partial summary judgment to the government, and ordering the Defendants "to comply with the requests for information issued by EPA." Aplts.' App., Vol. XII, at 704 (Mem. Decision & Order, filed July 9, 2018). The Defendants timely appealed.

## II

On appeal, the Defendants raise four arguments: (1) the EPA acted beyond the scope of its statutory authority when it issued the 2016 information requests; (2) the information requests are not reasonably relevant to the legislative purposes of CERCLA, as required by the Fourth Amendment; (3) the district court erred by enjoining Defendants to answer *all* of the EPA's information requests, even though Defendants had already answered most of them; and (4) the injunction ordering the Defendants to answer the information requests violates Rule 65(d) of the Federal Rules of Civil Procedure.

6

We first address the standard of review, which is disputed. We then address, and reject, each of the Defendants' arguments.

**A**

The parties disagree on the proper standard of review. The dispute arises from the dual nature of the district court's order—that is, a resolution of cross-motions for summary judgment and an injunction premised on that resolution. The government argues that we should review the district court's order for abuse of discretion because it is an injunction. *See, e.g.*, *John Allan Co. v. Craig Allen Co. L.L.C.*, 540 F.3d 1133, 1142 (10th Cir. 2008) ("We review a district court's decision to issue or deny a permanent injunction for an abuse of discretion."). The Defendants, on the other hand, contend that, "[i]n an appeal from summary judgment enforcement of agency information demands, this Court applies a *de novo* standard of review." Aplts.' Reply Br. at 1.

In scenarios such as this, the dual nature of a district court's order actually may implicate both standards of review. As we have explained before, "[w]hile we typically review a district court's grant of an injunction for abuse of discretion, we review de novo a summary judgment which serves as a basis for an injunction." *EagleMed LLC v. Cox*, 868 F.3d 893, 899 (10th Cir. 2017) (quoting *United States v. Hartshorn*, 751 F.3d 1194, 1198 (10th Cir. 2014)). Our de novo summary judgment review "requires us to examine the evidence in the light most

favorable to the nonmoving party to ascertain (1) whether any genuine issues of material fact exist and (2) whether the district court correctly applied the relevant substantive law." *Sierra Club v. Lujan*, 972 F.2d 312, 314 (10th Cir. 1992); *accord Morrison Enters. v. McShares, Inc.*, 302 F.3d 1127, 1133 (10th Cir. 2002).

"After reviewing the legal issues involved in the entry of summary judgment de novo, 'we review the district court's grant or denial of a permanent injunction for abuse of discretion.'" *EagleMed*, 868 F.3d at 899 (quoting *S.E.C. v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993)). An abuse of discretion stems from the exercise of "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999)). Yet, notably, the abuse-of-discretion standard of review "implies no single level of scrutiny by the appellate courts." Harry T. Edwards & Linda A. Elliott, FEDERAL STANDARDS OF REVIEW: REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS, Ch. V(A), Westlaw (database updated Feb. 2018); *accord High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1179 n.4 (10th Cir. 2019).

More specifically, "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384,

8

405 (1990); *see Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 971 (10th Cir. 2019) ("As always, however, a district court abuses its discretion when it 'bases its decision on an erroneous conclusion of law.'" (quoting *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011))).  Therefore, the de novo standard may play a role even under the overarching framework of the abuse-of-discretion standard in determining "embedded issues of law." *United States v. Wells*, 873 F.3d 1241, 1253 (10th Cir. 2017); *see Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 514 (10th Cir. 1998) ("A district court's denial of a motion for a new trial is reviewed for an abuse of discretion. . . .  When the district court's decision turns on an issue of law, however, its determination on that question is reviewed de novo." (citations omitted)).

Therefore, we will review de novo whether the EPA's "demand for information or documents" was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  42 U.S.C. § 9604(e)(5)(B)(ii).  Then, we will examine the propriety of the district court's injunction.

**B**

**1**

The Defendants first contend that the district court should not have ordered them to comply with the EPA's information requests because those requests exceeded the EPA's statutory authority to seek information under CERCLA.

9

More specifically, the Defendants make two arguments. First, they contend that the information sought regarding Talisker was not relevant to UPCM's "ability . . . to perform a cleanup." *Id.* § 9604(e)(2)(C). Second, they insist that the Talisker-related requests were not made "for the purposes of determining the need for response, or choosing or taking any response action under [CERCLA], or otherwise enforcing the provisions of [CERCLA]," as required by § 9604(e)(1). We address, then reject, both arguments.

**a**

According to the Defendants, the requested information about Talisker is not relevant to UPCM's ability to pay for or to perform cleanup because, under well-settled principles of corporate separateness, Talisker has a separate corporate existence from UPCM and, therefore, should be treated separately. *See Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974) (explaining that "a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity"). Moreover, as the Defendants reason, the Supreme Court has explicitly held that the presumption of corporate separateness applies in CERCLA cases. *See Bestfoods*, 524 U.S. at 62 ("[N]othing in CERCLA purports to reject this bedrock [corporate separateness] principle, and against this venerable common-law backdrop, the congressional silence is

10

audible."). Thus, the Defendants contend, because the government has not even alleged a corporate-veil-piercing theory, the information requested about Talisker is irrelevant to UPCM's ability to conduct or pay for clean up as a matter of law.

We disagree. It is undisputed that, pursuant to the plain terms of § 9604(e)(2), the EPA may request information from "any person" about a potentially liable party's ability to pay for or perform a cleanup, regardless of that person's own liability. And there are multiple undisputed facts that could have reasonably led the EPA to question whether UPCM's relationship with Talisker was at least partially responsible for its alleged failure to meet its work and payment obligations under the 2014 AOC. For example, in 2014, Talisker defaulted on a loan for which UPCM had pledged collateral. The lender initiated foreclosure proceedings against UPCM, and some of its properties were sold to satisfy Talisker's debts. Moreover, eleven years earlier, UPCM had been acquired by a company that was allegedly affiliated with Talisker. In light of all this, we can hardly say that the EPA made a "clear error of judgment," *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004), in concluding that it had an investigative interest in understanding the relationship between Talisker and UPCM.

11

**b**

Next, the Defendants insist that the Talisker-related requests do not comply with § 9604(e)(1) because they were not made "for the purposes of determining the need for response, or choosing or taking any response action under [CERCLA], or otherwise enforcing the provisions of [CERCLA]." 42 U.S.C. § 9604(e)(1). The Defendants' argument here consists of two parts. First, they contend that the government's proffered purposes for issuing the information requests were post hoc rationalizations on which the court could not rely. And second, they argue that even the government's alleged post hoc rationalizations fail to show that the requests were made for a proper purpose. We conclude that neither argument is persuasive to establish that the Talisker-related requests fail to comply with 42 U.S.C. § 9604(e)(1).

More specifically, under the Defendants' view, the government's only contemporaneous explanation of its purposes for making the information requests—that is, a boilerplate recitation of the § 9604(e)(2) categories—was insufficient to show that the requests were made for the purposes listed in § 9604(e)(1). The Defendants allege that the government later offered only three post hoc rationalizations for why the requests fall within the purposes of § 9604(e)(1). In its cross-motion for summary judgment, the government claimed that the requests

12

seek[] information to help EPA make decisions about . . . [1] whether to take over and complete the EE/CA [Engineering Evaluation/Cost Assessment] for OUs 2 and 3, [2] whether to implement the response action for OUs 2 and 3, once selected, or to allow or require UPCM to perform the response action, and [3] enforcing the provisions of CERCLA, including requirements in the 2014 AOC that UPCM prepare an EE/CA for OUs 2 and 3, perform the cleanup ultimately selected by EPA, and pay EPA's response costs.

Aplts.' App., Vol. VIII, at 397–98 (Gov't's Cross-mot. for Partial Summ. J., filed Feb. 28, 2018).

The Defendants insist that these explanations would fail to establish that the requests were made for proper purposes even if they were not post hoc rationalizations. According to the Defendants, the first explanation fails because the 2014 Agreement "specifie[d] the potential grounds for a work takeover, and none involve[d] UPCM's financial ability to pay or perform:

> 108. <u>Work Takeover.</u> In the event EPA determines that UPCM has ceased implementation of any portion of the Work, is seriously or repeatedly deficient or late in its performance of the Work, or is implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of all or any portion of the Work as EPA determines necessary. . . .

Aplts.' Opening Br. at 39 (omission in original) (quoting the 2014 AOC, Aplts.' App., Vol. II, at 86). "Indeed," the Defendants point out, "the U.S. conceded [that the] EPA [had] already decided, without the information sought through the disputed § 9604(e)(2)(C) requests, to take over the EE/CA preparation." *Id.* The

13

Defendants thus insist that the "EPA's ability to make that decision, along with the omission of financial ability from the enumerated, agreed-to grounds for work takeovers, defeat the notion that the sought-after information is relevant to a work takeover decision." *Id*.

As for the second explanation—that the EPA "issued the 2016 requests to assist it in determining 'whether to implement the response action for OUs 2 and 3, once selected . . ., or to allow or require UPCM to perform the response action'"—the Defendants argue that it fails for the same reason: the EPA had "already made that determination as well." *Id.* at 40 (quoting Aplts.' App, Vol. VIII, at 398). That is, the Defendants note that the 2014 AOC already expressly provides that the UPCM will "implement the cleanup once selected by EPA." *Id.* (quoting Aplts.' App., Vol. VIII, at 391–92).

Regarding the third and final explanation—that is, the EPA needed the information to assist it in "enforcing the provisions of CERCLA, including requirements in the 2014" AOC—the Defendants argue that this fails because "[e]nforcing the 2014 Agreement is not the same as enforcing CERCLA," and that the government "identified nothing in CERCLA that the requested information would enable EPA to enforce." *Id*. at 40–41 (quoting Aplts.' App., Vol. VIII, at 398).

As the Defendants assess the matter, the final nail in the coffin of the government's rationalizations was the revelation of the government's supposedly real reason for sending the information requests—to try to find information that might support an alter ego claim against Talisker. *See id.* at 41; Aplts.' App., Vol. XII, at 677 (Gov't's Reply in Supp. of Cross-Mot. for Partial Summ. J., filed Apr. 11, 2018) ("Here, of course, the United States is merely seeking information as part of an investigation to determine if [alter ego] claims might apply [to Talisker]."). According to the Defendants, this real reason behind the information requests "conflicts with § 9604(e)(1) and the legislative purpose of § 9604(e)(2)(C)" because "Congress never intended that EPA could pry into a company's sensitive . . . information with § 9604(e)(2)(C) requests to get a head start on discovery into the viability of a potential alter ego claim against affiliates." Aplts.' Opening Br. at 41–42.

In sum, according to the Defendants, the EPA's "obfuscation of the purpose[s] for its requests, followed by the [government's] shifting explanations for them . . ., [and] culminating with the [government's] admission that the requests were issued to cast about for potential alter ego evidence, [was] 'an abuse of discretion,' which render[ed] them unenforceable." *Id.* at 42–43 (quoting 42 U.S.C. § 9604(e)(5)(B)(ii)).

15

We are left unpersuaded by the Defendants' arguments. At the outset, we reject the notion that the government's three reasons for the information requests are impermissible post hoc rationalizations and thus inescapably arbitrary and capricious. Significantly, the Defendants cite no statute or caselaw that requires the EPA to expressly delineate, at the initial moment of making an information request, its precise grounds for doing so. Certainly nothing in CERCLA imposes this obligation on the EPA. The EPA's initial 2016 letters requesting the information quoted directly from § 9604(e)(2) and explained that the EPA sought, among other things, "[i]nformation relating to the ability of a person to pay for or to perform a cleanup." 42 U.S.C. § 9604(e)(2)(C). The Defendants have simply failed to show why this alone was inadequate—that is, why, in the 2016 requests, the EPA was obligated to explain how its requests complied with 42 U.S.C. § 9604(e)(1).

Furthermore, we hold that all of the EPA's requests fall within the purposes authorized by § 9604(e)(1). Again, those three approved purposes are: "[1] determining the need for response, or [2] choosing or taking any response action under [CERCLA], or [3] otherwise enforcing the provisions of [CERCLA]." 42 U.S.C. § 9604(e)(1). Because the language of § 9604(e)(1) is disjunctive, the government acts within its authority to make the requests so long as its reasons for doing so fall within any one of the three approved purposes. *See Loughrin v.*

16

*United States*, 573 U.S. 351, 357 (2014) (holding that—for the term "or"—the "ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings" (quoting *United States v. Woods*, 571 U.S. 31, 45–46 (2013))). We conclude that the EPA's reasons for making the requests reasonably fall within at least the second and third permissible purposes—i.e., choosing or taking any response action under CERCLA, and otherwise enforcing the provisions of CERCLA.

As we explained above, the government has argued that it made the information requests for three reasons—to help the EPA make decisions about

> [1] whether to take over and complete the EE/CA for OUs 2 and 3, [2] whether to implement the response action for OUs 2 and 3, once selected, or to allow or require UPCM to perform the response action, and [3] enforcing the provisions of CERCLA, including requirements in the 2014 AOC that UPCM prepare an EE/CA for OUs 2 and 3, perform the cleanup ultimately selected by EPA, and pay EPA's response costs.

Aplts.' App., Vol. VIII, at 398.

These three stated reasons reasonably fall within the second permissible purpose—"choosing or taking any response action under [CERCLA]." 42 U.S.C. § 9604(e)(1). The government believes UPCM is in material breach of the 2014 AOC, and has serious doubts about UPCM's capacity to ever perform under the agreement. The Defendants insist that the government has "presented no undisputed facts that would allow EPA to repudiate or rescind [the agreement]."

17

Aplts.' Opening Br. at 40. But the EPA does not need to do so. Even if it turns out that the government is wrong in its assessment of UPCM's ability to perform its obligations under the 2014 AOC, the EPA nevertheless could reasonably send out information requests for the purpose of "choosing or taking any response action." § 9604(e)(1). Regardless of whether UPCM has breached the 2014 agreement, the EPA can reasonably issue the information requests for the purposes of considering whether future enforcement options or even new agreements are necessary.

The three stated reasons for the information requests also reasonably fall within the third permissible purpose—"otherwise enforcing the provisions of [CERCLA]." 42 U.S.C. § 9604(e)(1). Again, the government believes UPCM has breached the 2014 AOC. We acknowledge that the parties disagree on this issue. But the fact remains that if UPCM is in breach, the government could pursue new enforcement actions, including a claim to recover costs it will incur itself to complete the work left unfinished due to UPCM's failure to perform under the 2014 AOC. *See* 42 U.S.C. § 9607(a), (f). The information requests would permit the EPA to—among other things—intelligently tailor any enforcement actions to the scope of the alleged breach.

The Defendants argue that the information requests do not fall within the third permissible purpose because enforcing the 2014 AOC "is not the same as

enforcing CERCLA." Aplts.' Opening Br. at 41. But this argument misunderstands the relationship between the agreement and the statute. The statute authorizes the EPA to enter into such agreements—to achieve the very purposes of the statute—and the statute also authorizes daily penalties for violations of consent decrees and administrative orders on consent. *See* 42 U.S.C. § 9609(a)(1)(E), (b)(5), (c)(5). Consequently, it simply strains credulity to suggest that the EPA's actions to enforce the 2014 agreement are not, fundamentally, the EPA's means of enforcing CERCLA itself.

## 2

The Defendants' second major argument is that the district court's order runs afoul of the Fourth Amendment because it requires them to comply with requests that are not reasonably relevant to the legislative purposes of § 9604(e)(2)(C). Recall again that this provision allows the government to access information "relating to the ability of a person to pay for or to perform a cleanup." 42 U.S.C. § 9604(e)(2)(C). The Defendants insist that, under the Fourth Amendment, the information requested must be "[r]easonably relevant"—that is, "relevant to legislative purposes." Aplts.' Opening Br. at 31 (quoting *United States v. Gurley*, 384 F.3d 316, 321 (6th Cir. 2004)). Based on a review of the statute's legislative history, the Defendants argue that the sole legislative purpose of § 9604(e)(2)(C) is to assess a person's ability to pay for or

conduct a cleanup *as a predicate to* entering a settlement agreement. Thus, because UPCM and the government already have entered into an agreement, the information request could not be relevant to the legislative purpose of § 9604(e)(2)(C).

We disagree. Generally speaking, a government agency's request for information satisfies the Fourth Amendment if it is "within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). We bear in mind here that, typically, an agency's "authority to request records and undertake other investigatory functions is extremely broad." *Santa Fe Energy Prods. Co. v. McCutcheon*, 90 F.3d 409, 414 (10th Cir. 1996). The EPA's information requests fully satisfy this general Fourth Amendment standard. As already discussed at length above, the requests fall squarely within the authority given to the agency under CERCLA, and the information is undoubtedly relevant in effectuating CERCLA's purposes. Moreover, unquestionably, the requests are sufficiently definite in their detail.

Yet, the Defendants argue for a narrower construction of the legislative purpose of § 9604(e)(2)(C) and, hence, what is required under the Fourth Amendment. They suggest that the statute's purpose is to assess a person's ability to pay for or conduct a cleanup as a precondition to entering a settlement

20

agreement. But the broad language of the statute belies this restrictive reading. The statute authorizes information requests to "any person who has or may have information . . . . relating to the ability of a person to pay for or to perform a cleanup"—without *any* reference to settlement agreements. 42 U.S.C. § 9604(e)(2)(C). In support of its narrower construction, the Defendants rely heavily on CERCLA's legislative history. Yet "[w]hat a legislature says in the text of a statute is considered the best evidence of legislative intent or will." *Holland v. Dist. Court*, 831 F.2d 940, 943 (10th Cir. 1987) (quoting 2A C. Dallas Sands, S[U]THERLAND ON STATUTORY CONSTRUCTION § 46.03 (4th ed. 1973)). Here, we see no reason to look well beyond the text of the statute in order to divine its purpose. And, therefore, we are unpersuaded by the Defendants' reading of the statute.

But, even assuming for the sake of argument that the Defendants are right about the statute's purpose, the information requests at issue are still "reasonably relevant" to that purpose—that is, to the determination of whether UPCM has the ability to pay for a cleanup as a predicate to potentially entering a *new* settlement agreement. As already discussed, the government believes that UPCM is currently in breach of the 2014 AOC. Irrespective of whether this is actually true, the information sought by the EPA is still reasonably relevant to—more specifically, helps to provide a predicate for—any assessment that the EPA might

21

need to make, in light of the Defendants' perceived breach of the 2014 AOC, about UPCM's financial fitness for possibly negotiating revisions to the 2014 agreement (i.e., *new* settlement terms) or even negotiating an entirely *new* agreement.

**3**

The Defendants also argue that the district court erred by enjoining them to answer *all* of the EPA's information requests, even though they had already answered most. More specifically, they argue that the district court should not have ordered them to comply with the requests they claim to have already answered because § 9604(e)(5)(A) only authorizes the commencement of a civil action to compel compliance with requests to which "consent is not granted." 42 U.S.C. § 9604(e)(5)(A).

We discern no error in the district court's ruling. Both request letters required a notarized certification of the completeness of the response. The EPA insists that the Defendants make these certifications. For their part, the Defendants do not deny that they failed to sign the certifications. Yet, without those certifications, the EPA has no firm assurance that the responses they have been given by the Defendants are complete and correct. Remember, in this situation, CERCLA instructs a court to "direct compliance with the requests or orders to provide such information or documents unless . . . the demand for

information or documents is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 9604(e)(5)(B)(ii). The EPA's insistence on certified responses to all its requests for information is neither arbitrary nor capricious nor an abuse of discretion nor otherwise unlawful; the certifications provided assurance of full compliance by the Defendants. Therefore, the district court's ruling was fully in line with the statute's mandate, and we uphold it.

**4**

Finally, the Defendants argue that the district court's injunction violated Federal Rule of Civil Procedure 65(d)(1)(C). That rule requires an injunctive order to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). The Defendants argue that the injunction here violated Rule 65(d)(1)(C) because it refers to the government's information requests and does not specify which parts of the requests must be answered.

With CERCLA's regulatory backdrop in mind, we discern no legal error in the district court's injunction and thus conclude that the court did not abuse its discretion. As the government points out, "the district court's order is not a typical injunction in the sense of an equitable remedy that a court develops on its own. Rather, the order is a statutory remedy specified by Congress." Aplee.'s

Resp. Br. at 40–41. That is, the district court directed the Defendants "to comply with the requests for information"—the exact remedy that CERCLA establishes. Aplts.' App., Vol. XII, at 704; *see* 42 U.S.C. § 9604(e)(5)(B)(ii) ("In the case of information or document requests or orders, the court shall enjoin interference with such information or document requests or orders or direct compliance with the requests or orders to provide such information or documents . . . ."). In short, we agree with the government that "[b]ecause CERCLA already specifies the precise type of relief that the district court ordered," there is no danger the Defendants will be left uncertain as to how to comply. Aplee.'s Resp. Br. at 41. Accordingly, we reject this challenge of Defendants to the legal propriety of the court's injunction.

## III

For the foregoing reasons, we **AFFIRM** the district court's summary judgment and permanent injunction order.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

24